**Bobby L. FORREST and Gerard E. Kiefer, d/b/a Forrest & Kiefer, a legal partnership**

v.

**The CAPITAL BUILDING & LOAN ASSOCIATION et al.**

Civ. A. No. 72–189.

United States District Court, M. D. Louisiana.

May 25, 1973.

Bobby L. Forrest of Forrest & Kiefer, Baton Rouge, La., for plaintiffs.

R. Gordon Kean, Jr., of Sanders, Miller, Downing & Kean, Kleinpeter & Nevils, Baton Rouge, La., for Baton Rouge Sav. and Loan Ass'n, defendant.

Roland C. Kizer of Kizer & Kizer, Baton Rouge, La., for Home Sav. & Loan Ass'n, defendant.

Cyrus J. Greco, Baton Rouge, La., for Guaranty Federal Sav. & Loan Ass'n, defendant.

Carlos G. Spaht, Ashton L. Stewart of Kantrow, Spaht, Weaver & Walter, Laycock & Stewart, Baton Rouge, La., for Union Federal Sav. and Loan Ass'n, defendant.

Alton J. Reine, Jr., of Watson, Blanche, Wilson & Posner, Baton Rouge, La., for Citizens Sav. & Loan Ass'n, defendant.

T. F. Phillips of Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for The Capital Building and Loan Ass'n, defendant.

## MEMORANDUM OF REASONS

COMISKEY, District Judge.

This is an anti-trust action in which jurisdiction is based on 15 U.S.C. §§ 1, 2, 15, 26 with an amount in controversy in excess of $10,000 pursuant to 28 U.S.C. § 1331.

Plaintiffs are attorneys engaged in the practice of law in East Baton Rouge Parish. The defendants are building and loan associations, (referred to as homesteads in Louisiana) who are chartered under the laws of Louisiana and of the United States, whose principal activity is the making of home and commercial mortgage loans to secure financing on real property. They are also in the savings industry wherein their depositors are paid a return on investments deposited with them. Plaintiffs allege that the homesteads have conspired to dominate the legal, notarial and title insurance business by making a condition of any loan the use of attorneys selected by the defendants which results in a systematic exclusion of plaintiffs as attorneys from this market place.

The parties have filed cross motions for summary judgment. In addition to the statements of uncontroverted material facts offered to support their respective motions, the parties have stipulated eighteen paragraphs of facts.[1] Thus these motions involve only issues of law. Commercial Metals Company v. Walker, 5 Cir. 1971, 439 F.2d 1103, 1104; Cole v. Chevron Chemical Division, Oronite Division, 5 Cir. 1970, 427 F.2d 390, 393.

## I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

■■ Plaintiffs' motion is based on 15 U.S.C. § 1 and § 2 and goes only to liability. Plaintiffs concede that only unreasonable restraints of trade are prohibited by the statutes. Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). However, they allege the practices involved constitute a tying arrangement which has such a pernicious effect on competition and a lack of any redeeming virtue as to be classified as per se violations without detailed inquiry as to their precise harm or the business justifications for their existence. No. Pacific Railway Company v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agree that he will not purchase that product from another supplier, 54 Am.Jur.2d, Monopolies § 59.

In the present case the tying product is the credit, or money, advanced to the borrower while the tied product is the legal and notarial services required to consummate the credit transaction.

As a condition to the lending of their funds, each defendant requires that attorneys of its choice certify to it that the borrower has a good and merchantable title, free of liens and encumbrances, to the property to be given as security for a loan. Each defendant requires that security documents executed by the borrower to give the lender a first mort-

gage on the borrower's property be prepared, recorded, etc. by the attorneys who are annually selected by its Board of Directors. Each borrower is required, as a part of the cost to him for the loan, to pay the homestead an amount equal to its costs, including its costs for the services of the attorneys annually selected by it for a title opinion and preparation of the security documents, which charges are in turn paid by the homestead to the attorneys. In the case of Citizens Savings and Loan Association the borrower may at his option pay the charges for title examination and preparation of security documents directly to Citizens' attorneys. The defendants do not accept attorneys selected by the borrower to certify to the homestead the borrower's title to the property given as security for the loan of the funds of the homestead, or to draft, etc., the security documents. However, the borrower may employ an attorney of his choice, at his cost, and obtain from him a title examination, and have his attorney present at the execution of the mortgage, but the homesteads do not require the borrower to do so. The applicant for a loan has the privilege of either accepting or rejecting the loan if he does not choose to accept any of the conditions under which it will be made. (Stipulation Paragraphs six and seven).

The test urged by plaintiffs makes tying arrangements unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected. Fortner Enterprises, Inc. v. United States, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific R. Co. v. United States, 396 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

We must first attempt to define sufficient economic power. Fortner Enterprises Inc. v. U. S. Steel Corp., *supra,* involved an arrangement whereby the defendant's wholly owned subsidiary, U.

S. Steel Homes Credit required as a condition of credit that plaintiff purchase at artificially high prices only U.S. Steel prefabricated homes. The district court granted summary judgment and the Supreme Court reversed. The court in discussing sufficiency of economic power stated:

"The standard of 'sufficient economic power' does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakingly clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. . . . 'Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from the uniqueness in its attributes.' "

Fortner Enterprises, Inc., 394 U.S. 495, pp. 502–503, 89 S.Ct. 1252, p. 1258.

In the present case plaintiffs base the major thrust of their argument on sufficiency of economic power on affidavits regarding the desirability and uniqueness of homestead credit. However, defendants compete with other banks for deposits and are also in competition for loans with private lenders, insurance companies, mortgage bankers and state and national banks. This presents a fact issue to the court which can be resolved only through the accumulation of statistical data via discovery and the testimony of live witnesses.

A per se violation next requires that a not insubstantial amount of interstate commerce be involved. This also is a fact issue. Although the parties have stipulated that all the defendant homesteads are members of the Federal Home Loan Bank, and as such are able to borrower funds from such Board when their deposits are inadequate to meet the demands for loans, there is no evidence to show the volume, if any, of

the use of this privilege. The parties also stipulate that the defendants advertise on various broadcast media which reach outside of Louisiana and in newspapers in Baton Rouge which have some circulation out of state. Plaintiffs have also alleged that some depositors live out of state and that perhaps some loans are made out of state. However, none of the factors alleged or stipulated are at this point sufficient to characterize the interstate nature of defendants' business. This is not to preclude a finding of interstate commerce but simply defers a categorization until further discovery reveals percentages of loans and depositors out of state and the exact structural arrangement of defendants' with the Federal Home Loan Bank Board.

The next requirement is that there must be an appreciable restraint of free competition for the tied product, namely, legal services. This requirement becomes relevant only if in fact there is a tying product and a tied product. For reasons recited later in the treatment of defendants' motion this requirement is irrelevant. No two products, tying and tied, are present in this case. Only one product is sold or extended in the market place, i. e. home and commercial credit.

## DEFENDANTS' MOTIONS

 Before us also are motions for summary judgment and to dismiss and/or to stay by all six defendants. They encompass these basic contentions.

1. Lack of jurisdiction since the alleged illegal acts charged in the complaint are not in interstate commerce nor do they effect interstate commerce.

2. Failure to state a claim upon which relief may be granted, since plaintiffs fail to allege any public injury from the illegal acts.

3. The acts which plaintiffs complain of are subject to the initial primary jurisdiction of the Federal Home Loan Bank Board whose jurisdiction plaintiffs have not properly invoked.

4. Homesteads are cloaked with immunity under the principles enunciated in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)

5 Homesteads have a right to select their own attorney to perform legal services for them.

6. No tie in arrangement can exist since only one product is sold—home credit.

The sixth, or last asserted point will be discussed first. A treatment of this and of point five will moot the need to treat the other points.

The first question which must be answered is whether or not the two products, credit and legal services, are separate. In American Mfgs. Mut. Ins. Co. v. American Broadcasting, 2 Cir. 1967, 388 F.2d 272, cert. den. 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972) we find this statement: "Indeed, it is axiomatic that a tie-in analysis begins with the question of separability—the requirement that the tying and tied products be different, or, stated simply, that the forced purchase be of a second distinct commodity." As Professor Turner stated in the Harvard Law Review:

"The requirement that they (the tying and a tied product) be 'different' obviously cannot be dropped out. Every manufactured item is a combination of various materials and components. There are obvious cases in which we would say either that there is no tie-in because the object of the sale is a single product, or that if there is a tie-in, it should not be deemed illegal per se or even illegal at all". Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv. L.Rev. 50, 67–68 (1958).

The fact that the alleged tied products in our case are mainly professional services, i. e. legal and notarial services, does not change the applicability of this concept. The fact that the tying product is the extension of credit does not change the concept. Credit is a commodity as much as a tangible piece of property.

Fortner Enterprises, Inc. v. United States Steel Corp., *supra*.

The need to first determine the separability of the two products was underscored by Justice Black in *Fortner* 394 U.S. at p. 507, 89 S.Ct. at p. 1260 when he stated,

"There is at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved. In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product. In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product."

In Times Picayune Publishing Co. v. United States of America, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) the United States brought a civil action against a single publisher of morning and evening newspapers in New Orleans for Sherman Act violations because the publisher's advertising contracts required advertisers to buy space in both newspapers. The court found no violation because both newspapers were found to sell the same product to advertisers, namely, readership.

In the case at bar we find that no two products exist. The stipulations entered into by the parties show as an uncontroverted fact that the legal services are owned, contracted for, responsible solely to, and work exclusively for, the defendant homesteads. These services are not for sale to the prospective borrower but are merely an incidental service required both by state law and federal regulation to consummate the loan.

Stipulation 10 [1] states that both parties agree that these legal services are performed for the benefit and sole interest of the homestead. The borrower realizes only the receipt of the loan. At the same time Stipulation 8 [1] makes it clear that the borrower is not prohibited from selecting his own counsel and that he may employ counsel if he so wishes.

Homesteads as a matter of law and as a matter of policy must lend their money on mortgage securities. The mortgages must be valid. To insure this, land titles must be examined and acts of mortgage legally executed. Under the mandate of LSA–R.S. 6:833, subd. A— "Every loan on immoveable property shall be secured, . . . . by vendor's privilege and first mortgage upon property within its primary lending area, unencumbered . . . accompanied by certificate *of the attorney of the association to that effect*" . . . (emphasis added).

Louisiana homesteads must by law obtain mortgages and lend money only when certificates of their attorneys show the property to be unencumbered. Furthermore, the homesteads are authorized by law to pass all the costs of loan expenses on to the borrower. LSA–R.S. 6:830 provides:

a. Fees and charges. Every association may require borrowing members to pay all reasonable expenses incurred in connection with the making, closing, disbursing, extending, readjusting, or reviewing of real estate loans. Without limiting the generality of the foregoing, such expenses may include appraisal, attorney, abstract, notary, recording, necessary certificates, researching, and registration fees, title examination, title insurance, loan insurance, credit report, survey, drawing of papers, escrow services, loan closing costs, and taxes or charges imposed upon or in connection with the making and recording of any loan. Every association also may require borrowing members to pay the cost of all other necessary and incidental services rendered by the association or by others in connection

1. See Appendix.

with real estate and other loans in such reasonable amounts as may be fixed by the board of directors. Without limiting the generality of the foregoing, such costs may include the costs of services of inspectors, engineers, and architects. Such initial charges may be collected by the association from the borrower and paid to any persons, including any director, officer, or employee of the association rendering such services, or paid directly by the borrower. The fees and charges authorized by this and the preceding section shall be in addition to interest authorized by law, and shall not be deemed to be a part of the interest collected or agreed to be paid on such loans within the meaning of any law of this state which limits the rate of interest which may be exacted in any transaction. No director, officer, or employee of an association shall receive any fee or other compensation of any kind in connection with procuring any loan for an association, except for services actually rendered as above provided.

In addition to the state regulations the Federal Home Loan Bank Board has also promulgated regulations which require members to loan money with real property as security only on certificates from the *institution's* attorney. Title 12 CFR, Section 563.17–1 (c)(1) (VII) requires the homestead records to contain "an opinion signed by such institution's attorney at law . . ." Additionally, Section 563.35(a) and (c) of these regulations provide:

(a) No insured association . . . may grant any loan . . . on the prior condition . . . that the borrower contract for any of the following with any specific . . . person:

(3) Legal services, including title examination . . . and . . .

(c) The prohibition contained in subparagraph (3) of paragraph (a) of this section shall not be construed to prohibit the insured institution from requiring the borrower to pay an initial loan charge to reimburse the institution for legal services rendered by the institution in connection with the processing and closing of a loan.

At first blush this regulation may seem to prohibit the practice alleged in the complaint. However, after careful examination of the regulation and comparison to the stipulations submitted by the parties, we have concluded that the regulation is aimed at keeping a homestead from preventing a borrower from hiring his own attorney while at the same time affirming the homestead's right to hire counsel. The stipulations filed by the parties acknowledge the right of the borrower to hire his own counsel.

12 CFR 545.670 provides for the charging of fees to offset legal expenses.

Section 545.670 Initial Loan Charges. . . . . Borrowers may be required to pay the necessary initial charges in connection with the making of a loan, including the actual costs of title examination, . . . such necessary initial charges may be collected by the association from the borrower and paid to any persons, including any . . . attorney or firm rendering such services . . . .

It is apparent then, that the homestead's legal and notarial services are not owned by, controlled by, acquired by, bargained for or even responsible to the borrower. These legal services are not "for sale" to prospective borrowers but are necessary steps in the orderly conduct of defendants' business, both from the practical viewpoint of unencumbered security and from the legal viewpoint since it is required by law. Neither party disputes the fact that the services are paid for by the borrower. This arrangement is sanctioned by both federal regulation and by state law. A totally

different situation would be presented if the borrower was not allowed to retain his own counsel.

In the traditional tie in case the tying product is almost invariably attempting to use its dominance in the tying field whether it be by patent dominance, copyright dominance, exclusive dealing requirements, or pure economic power to foreclose competition in the tied field (legal and notarial services). Almost without exception the restraint in the tied product market gives the offender some pecuniary advantage. In other words the tie in sale helps the tying offender to grow bigger, to get richer, to have more sales and to economically conquer more markets.

International Salt would sell more salt if it could require lessees of its patented machines to use only its salt. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Standard Oil would sell more tires and batteries in the Western states if their franchised stations were required to buy tires and batteries in order to get gas. Standard Oil Company v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, reh. den. 338 U.S. 808, 70 S.Ct. 545, 94 L.Ed. 489 (1949). United States Steel would certainly sell more portable homes if its affiliates could require its borrowers to erect only portable homes manufactured by U. S. Steel. Fortner Enter. Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

In our case the alleged tied product— legal and notarial services—will not cause the defendants to increase their volume of loans, or earn more money. It is uncontroverted that the use of the defendants' counsel for exclusive closing of loans is solely a measure to insure that the lender gets good and valid security for the home loan and is no more than a compliance with state law and federal regulation.

■ Since no two products exist and the proof of a tying arrangement is impossible, we must next consider whether plaintiffs' complaint, when liberally interpreted, encompasses violations of general standards of the Sherman Act. The Court recognizes that the failure of the plaintiff to meet the "per se" test is not necessarily fatal to his proof on the merits. Fortner Enter. Inc., id. The Court also takes cognizance of the Supreme Court's warning in Poller v. Columbia Broadcasting, 368 U.S. 464, 473; 82 S.Ct. 486, 491; 7 L.Ed.2d 458 (1962):

> "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice'."

■ However, this admonition should not be interpreted as totally precluding the use of summary judgment in antitrust proceedings. Rather, it should make the district court doubly aware of the necessary criteria for summary judgment which are to be even more precisely and stringently applied in antitrust proceedings.

In the present case plaintiff in a supplemental memorandum has listed six alternative violations of the antitrust laws which could be maintained in lieu of a "per se" violation:

1. Tying arrangements—both per se and under general standard of reasonableness after additional proof at a trial on the merits.

2. Requirements contracts

3. Concerted Refusal to deal

4. Exclusive dealing

5. Price fixing

6. Any of the above as shown under 15 USC § 2 to be an attempt or conspiracy to monopolize or actual monopolization.

■ By its very definition a per se violation is now precluded. A per se violation is conclusively presumed to be unreasonable and illegal and needs no detailed proof to establish a violation. Plaintiff can now prevail only by showing that the purposes and effects of the practices involved violate the general standards of the act.

■ However, even this is impossible. Each of the first four allegations necessarily rest on the premise that he who pays for the services owns the services and therefore has a right to select who will render them. This is a misapprehension of the facts. The borrower has no contract with the homestead attorney. The homestead attorney works exclusively for and certifies solely to the homestead. At the same time the borrower is not precluded from hiring an attorney to represent him. If a factor such as this were present then our decision may be entirely different. It is a well established principle that a party is entitled to have counsel of his choice. The fact that a homestead is allowed to select its own counsel but is permitted to pass the cost on to the buyer is confirmed in both federal and state law. The homestead is not refusing or excluding anyone from the legal and notarial business. It is simply exercising a fundamental right to select its own counsel. No "requirements contract" is present since the legal services referred to are not even for sale to the borrower but belong exclusively to the homestead. For the same reason no general standard violation through tying can be shown if no tied product exists. As has been repeatedly stated, these legal services are all part of the one credit transaction.

It is ironic that plaintiff should allege price fixing based on the abolition of the minimum fee schedule prescribed by the Louisiana Bar Association. This fee schedule itself was only recently abolished because of an attack under 15 U.S.C. § 1 by the United States Department of Justice Anti-Trust Division. Plaintiff in supplemental memorandum alleges that "the arrangement between

client and attorney are personal to the parties. There is no allegation by the defendant that all homesteads have conspired together to fix the price which their attorneys will charge borrowers to close loans. The attorneys have not been joined as parties to the suit. Plaintiffs' allegation, to use his own language, does not rise above the realm of possibility.

Plaintiffs' final allegation is that any one of the above five violations of Section 1 might also be a violation under 15 U.S.C. § 2. Generally speaking 15 U.S.C. § 1 deals with means and 15 U.S.C. § 2 deals with ends. 15 U.S.C. § 1 forbids all means of monopolizing trade by unduly restraining it by means of contracts and combinations. 15 U.S.C. § 2 condemns the result to be achieved rather than the form of the combination or the particular means employed. See, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). However, as has been repeatedly stated, the only result achieved under the facts alleged by the plaintiff and under the stipulations entered by the parties is that a homestead is permitted and obligated by law to employ an attorney of his own selection. At the same time both federal and state regulations permit the charge for these services to be passed on to the potential borrower. This practice is sanctioned and required by law and is no more than good business practice to protect security offered for a loan.

Therefore, the plaintiffs' motion for summary judgment is hereby denied. The motion of defendants for summary judgment is granted, and the case is dismissed.

## APPENDIX
### STIPULATION

The following facts are to be accepted for the purpose of the trial and decision of pending motions:

#### 1.

The plaintiffs, Bobby L. Forrest and Gerard E. Kiefer, are residents of the

Parish of East Baton Rouge, and practice law as partners, with offices in the City of Baton Rouge, and a substantial portion of their practice involves the handling of real estate matters.

### 2.

Each association defendant is a separate mutual corporation, each having its own officers and Board of Directors, elected by its membership. There are no interlocking directors and the status of each is set forth below:

(A) The defendants, The Capital Building & Loan Association, Home Savings & Loan Association, Baton Rouge Savings & Loan Association and Citizens Savings & Loan Association are Louisiana savings and loan institutions, domiciled in the Parish of East Baton Rouge, Louisiana, and are organized, exist and operate under the provisions of LSA–R.S. 6:701–6:936. The deposits in the associations are insured by the Federal Savings & Loan Insurance Corporation, and as such they are subject to the supervisory jurisdiction and regulations relating thereto (Title 12, Code of Federal Regulations—The Rules and Regulations of the Insurance of Accounts). The defendant associations are also members of the Federal Home Loan Bank and their operations are subject to the supervisory jurisdiction and regulations of the Federal Home Loan Bank Board, namely, Title 12, Code of Federal Regulations—The General Regulations of the Federal Home Loan Bank Board.

B. The defendant, Guaranty Federal Savings and Loan Association, is a federal chartered savings and loan association domiciled at Baton Rouge, with permanent offices in Baton Rouge and Zachary in the Parish of East Baton Rouge, and the mobile office which serves New Roads, St. Francisville, Jackson and Clinton in the Parishes of Pointe Coupee, East Feliciana and West Feliciana. It is organized and exists under provisions U.S.C.A., Title 12, Section 1461 et seq. The deposits in the association are insured by the Federal Savings and Loan Insurance Corporation and as such are subject to the supervisory jurisdiction and regulations thereto (Title 12, Code of Federal Regulations—Rules and Regulations of Accounts).

The defendant, Guaranty Federal Savings and Loan Association, is also a member of the Federal Home Bank System, and its operations are subject to the supervisory jurisdiction and regulations of the Federal Home Loan Bank Board, namely, Title 12, Code of Federal Regulations—The General Regulations of the Federal Home Loan Bank Board.

Both entities are agencies of the Federal Government, created by Federal statutes, with their principal offices in Washington, D. C. The regional office of the Federal Home Loan Bank Board charged with the responsibility for this area is located in Little Rock, Arkansas.

C. Union Federal Savings & Loan Association (Union Federal) is a federally chartered savings and loan association, domiciled in East Baton Rouge Parish, and is subject to the rules and regulations of the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation, as set forth in Title 12 of CFR.

### 3.

The defendants are engaged in lending large sums of money to commercial and residential property owners in Louisiana, principally in the Baton Rouge area, and the loan funds which they have available create a substantial source of credit for commercial and residential property owners in the Baton Rouge area.

### 4.

Each defendant is an eligible borrower from the Federal Home Loan Bank and the availability of such funds is dependent upon the Federal regulations and policies relating thereto. The amount of available funds actually borrowed is dependent upon the unilateral action of each association.

**5.**

The procedures used in drawing on the line of credit with the Federal Home Loan Bank are as follows:

(1) The Federal Home Loan Bank of Little Rock deposits the funds in a bank in Little Rock, Arkansas, and the defendants' local banks draw against these accounts through normal interstate banking procedures.

(2) The Federal Home Loan Bank of Little Rock may, at times, simply mail a check to the defendants. In either event, as part of the credit transactions, notes and other credit instruments are executed and exchanged through the United States mail between the defendants and the Federal Home Loan Bank.

**6.**

A copy of a letter of plaintiffs dated April 26, 1972, was forwarded to the Little Rock, Arkansas office of Federal Home Loan Bank Board. A copy of said letter is attached hereto as Annex 1. The plaintiffs received from the Federal Home Loan Bank Board a letter dated June 6, 1972, signed by Jack M. Ferguson, a copy of which is attached hereto as Annex 2.

**7.**

As a condition to the lending of their funds, each defendant requires that attorneys of its choice certify to it that the borrower has a good and merchantable title, free of liens and encumbrances to the property to be given as security for a loan. Each defendant requires that security documents executed by the borrower to give the lender a first mortgage on the borrower's property be prepared, recorded, etc., by the attorneys who are annually selected by its Board of Directors. Each borrower is required as a part of the cost to him for the loan to pay the association an amount equal to its costs, including its costs for the services of the attorneys annual-ly selected by it for a title opinion and preparation, etc., of the security documents, which charges are in turn paid by the Association to the attorneys. In the case of the Citizens Savings & Loan Association the borrower may at his option pay the charges for title examination and preparation of security documents directly to Citizens' attorneys. The defendants do not accept an attorney selected by the borrower to certify to the association the borrower's title to property given as security for the loan of the funds of the association, or to draft, etc., the security documents.

**8.**

The borrower may employ an attorney of his choice, at his cost, and obtain from him a title examination, and have his attorney present at the execution of the mortgage, but the associations do not require the borrower to do so. The applicant for a loan has the privilege of either accepting or rejecting the loan if he does not choose to accept any of the conditions under which it will be made.

**9.**

The principal source of income of each defendant is the interest which it receives on loans made, but each defendant charges the borrowers, on occasions, in addition to its costs for attorneys, appraisers, etc., additional fees, including charges designated as "origination fee", "assumption transfer fee", "application fee" and "inspection fees". The associations utilize different terminology to describe their fees and charges.

**10.**

The title examination and mortgage drafting services rendered to each association by the attorneys annually selected by its Board of Directors are for the benefit and sole interest of the association; the only thing the borrower realizes from such services is the receipt of the loan from the association.

**11.**

Each association's attorneys are paid separately for other legal services rendered to the association, either in the form of a retainer or through a separate billing, or both.

**12.**

Each of the associations advertises in various media available in the Baton Rouge area, and it is admitted that the broadcast signals of certain of the television and radio stations used reach areas outside of the State of Louisiana and that the newspapers in Baton Rouge have some circulation outside of the state.

**13.**

Every transaction in which the Federal Home Loan Bank of Little Rock is involved necessitates an exchange of documents and funds through interstate mail.

**14.**

All loans made by the defendant associations are secured by property situated in the State of Louisiana, and principally in the Baton Rouge area, and none of the loans which they have made have been sold or transferred to out-of-state loan institutions for the period pertinent and material to this suit. The associations have not participated with out-of-state lenders in connection with any loans which they have made.

**15.**

All of the transactions which the plaintiffs contend that they were not permitted to handle related to property situated in the Parish of East Baton Rouge or immediately adjacent parishes.

**16.**

Title certification to the association by the institutions attorney is one of the requirements of Federal Regulations and is required by the several associations as a matter of choice and state law.

**17.**

Total fees received by attorneys for the services they performed in connection with title certificates, preparation and execution of credit instruments were substantial. A substantial volume of services was rendered by the attorneys in consideration of such fees, and the attorneys have continuing, long-term responsibility for the validity and merchantability of titles which they have certified.

**18.**

The real estate business in the Baton Rouge area may be unique from other areas in that the following customs and procedures are followed:

(1) Traditionally no bonded title guaranty company maintains offices in Baton Rouge or the surrounding areas and no real estate transactions are handled by such organizations.

(2) While there are commercial abstract companies doing business in Baton Rouge and the surrounding parishes, their services are limited to the preparation of abstract to be furnished to attorneys who are handling the real estate transactions.

(3) Attorneys either prepare their own abstracts from the public records of the offices of the Clerk and Recorder of Mortgages for the Parish, or obtain abstracts from such commercial abstract companies whose services are available, and examine titles and certify title to the property.

(4) In the usual real estate transaction the purchaser and lender rely upon an attorney's certification of title, and title insurance, though available, is not customarily required or obtained. This custom is followed by all the defendant associations except Guaranty, which now requires title insurance.

Each of the parties to this stipulation suggests that there are other facts about which there is no material dispute but which could not be agreed upon or which were not considered for inclusion in

this stipulation and reserves the right to individually file a statement of such facts or affidavits relating thereto. Further, it is understood by the parties hereto that as to matters contained herein which are the subject of testimony of the parties or their officers in depositions previously taken, the item of stipulation constitutes a summary and should not be construed as limiting such sworn testimony.

Signed at Baton Rouge, Louisiana, this 25th day of May 1973.