Daniel C. FOSTER et al., Appellants,

v.

MARYLAND STATE SAVINGS AND
LOAN ASSOCIATION.

No. 76–1455.

United States Court of Appeals,
District of Columbia Circuit.

Argued 27 Oct. 1977.

Decided 12 June 1978.

As Amended on Denial of Rehearing
26 July 1978.

As amended 24 Oct. 1978.

Certiorari Denied 8 Jan. 1979.

See 99 S.Ct. 842.

William A. Dobrovir,. Washington, D. C., with whom Cornish F. Hitchcock, John F. Graybeal, Michael D. Fischer and Benny L. Kass, Washington, D. C., were on the brief, for appellants.

John P. Arness, Washington, D. C., with whom David J. Hensler and Wallace A. Christensen, Washington, D. C., were on the brief, for appellee.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Concurring opinion filed by Circuit Judge LEVENTHAL.

Concurring statement filed by Circuit Judge MacKINNON.

WILKEY, Circuit Judge:

This private antitrust action challenges, as a violation of Section 1 of the Sherman Act,[1] the practice followed by the defendant of requiring borrowers to pay an attorney's

---

1. 15 U.S.C. § 1 (Supp. V 1975).

fee charge for services rendered to the defendant in connection with each loan. The defendant is a federally-insured mutual savings and loan association, engaged in the business of making loans on residential property. The defendant requires borrowers to pay the attorney's fee charge only if they employ counsel other than the law firm retained by the defendant, and waives the requirement where borrowers use the defendant's law firm for settlement. Plaintiffs are a class of those borrowers who paid the attorney's fee charge as a cost of their loans because they employed their own counsel for legal settlement services.[2]

Plaintiffs contend that the defendant's loan practice constitutes a *per se* illegal tie-in sale of legal services to the sale of credit, and an unlawful restraint of trade on the market for legal settlement services. At the close of plaintiffs' case, the District Court directed a verdict in favor of the defendant on the alleged antitrust violations. Plaintiffs now challenge the District Court's ruling on the ground that their evidence sufficiently made a case for the jury.

 In determining whether a directed verdict is appropriate the governing principle is that a directed verdict is proper where, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict.[3] Under this principle the court is bound to view the evidence in the light most favorable to the plaintiffs, giving them the advantage of every fair and reasonable inference that the evidence may justify.[4] Examining the record in the light of this principle, we agree with the District Court that the evidence and permissible inferences therefrom conclusively demonstrate that no tying arrangement or unlawful restraint of trade is presented by the circumstances of this case. We accordingly affirm.

## I. THE ALLEGED TYING ARRANGEMENT

Before developing the antitrust law on tie-in sales, it is essential to have clearly in mind what services are involved here, and to whom. Of the $100 standard legal fee paid by the defendant lender to its selected counsel and charged as a cost of the loan to the borrower, $35 is for the preparation of a mortgage. Mortgages are the business of the lender; it has a definite interest in the validity of the security instrument and prudently should only accept an instrument prepared or approved by its own counsel. Sixty-five dollars is for examination of the title. In this matter both the lender and the borrower have an interest; a common interest—yet in this metropolitan area, where the percentage of the value loaned on homes is substantial, the lender ordinarily will have the greater financial stake in the title, as he initially puts up more of the purchase money. While title insurance is customarily purchased by the borrower (it may be required by the lender), title insurance policies frequently carry exceptions, whose legal effect must be evaluated by both parties to the loan transaction.

The lender has the same right as the borrower to insist on its own counsel. The defendant lender here, after an unsatisfactory period of experience permitting the borrower to select his own counsel from a large group of highly rated lawyers (but not necessarily real estate specialists), whom the lender would then use as well, settled upon the practice of employing only one law firm to protect its interest in all these similar home loan transactions. State law and federal regulations allow the lender to charge the borrower for the legal work done for benefit of the lender as a necessary cost of the loan. Irrespective of which counsel is chosen by the borrower, the bor-

---

**2.** Plaintiffs include four named plaintiffs and approximately 1,151 home buyers who obtained loans from the defendant during the period between January 1971 and December 1975. Over the same span, the defendant made loans to approximately 4,800 home buyers who were not required to pay the attorney's fee charge

because they retained the services of the defendant's law firm in the first instance.

**3.** *Klein v. District of Columbia*, 133 U.S.App. D.C. 129, 132, 409 F.2d 164, 167 (1969).

**4.** *Id.*

rower will thus inevitably pay for the legal services provided to the lender.

The only practical question is whether the borrower will pay for his own separate legal counsel, as well as the lender's, where the interests of the two parties are congruent. Since the parties have identical interests in the validity of the title, and since any conflict between lender and borrower in regard to the mortgage instrument is mostly theoretical (the lender will not lend unless the mortgage is completely satisfactory to it, and probably will insist on using its own mortgage form), one lawyer can effectively and fairly serve both lender and borrower on all questions in which the lender is interested. The borrower-buyer, of course, needs counsel for other purposes concerning, e. g., his legal relation to the seller of the property.

This being the parties' situation in the usual home sale and purchase-mortgage transaction, beginning in 1971 the defendant lender adopted the policy of waiving the $100 fee it customarily paid its selected counsel and charged the borrower, if the borrower also employed this same law firm and paid the firm directly for all services rendered to the borrower (which services, as shown above, necessarily embraced the two areas—title validity and the mortgage instrument—of interest to the lender).

■ After this detailing of the fact situation, we turn to the law of tying arrangements. A tying arrangement has been defined as an "agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."[5] Such arrangements are presumptively unlawful under the antitrust laws, "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected."[6] Before an unlawful tying arrangement may properly be found, however, it must be determined that "two separate products are in fact involved."[7]

■ The record in this case clearly reveals that separate products were not involved in plaintiffs' "purchase" of the residential property loans. The loan review services performed by the selected law firm were provided to and paid for by the defendant as an additional means of insuring the security of its loans.[8] The attorney's fee charge collected by the defendant to pay for these services was not demonstrably excessive, and did not enable the defendant to secure a profit.[9] Pursuant to both federal regulation[10] and Maryland state law,[11] the defendant was authorized to charge its borrowers for these legal expenses. Under these circumstances, plaintiffs' payment of the attorney's fee charge to the defendant lender represented an incidental and inseparable part of their "purchase" of the loans, rather than the "purchase" of a tied product.

5. *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

6. *Id.* at 6, 78 S.Ct. at 518.

7. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969).

8. Every member of plaintiffs' class purchased legal settlement services from an attorney other than the defendant's. Although the legal services purchased by plaintiffs from their own attorneys constitute a separate or distinct product, the additional loan review services paid for by the defendant do not, since they were purchased by plaintiffs merely as an incident to the loan transaction.

9. Contrary to plaintiffs' assertions, no evidence was introduced to demonstrate that the $100 charge collected by defendant and paid to its attorney exceeded the amounts charged by other attorneys for similar legal services. The defendant's only economic interest in these loan transactions was the premium and interest it earned on the loans, since it remitted all of the fees to the law firm, without any profit. J.A. at 329, 463.

10. 12 C.F.R. § 563.35(c) (1975) (current version at 12 C.F.R. § 563.35(d) (1977)). *See* p. 10 *infra.*

11. Md.Code Ann. art. 23, § 161GG (1973). *See* p. 11 & note 24 *infra.*

*Forrest v. Capital Building & Loan Association*[12] involved a practice identical in all material respects to the residential loan practice at issue in this case. The defendant savings and loan associations permitted their borrowers to employ an attorney of choice for legal settlement services, but required borrowers as a condition of a loan to pay the legal fees of attorneys selected by the defendants to examine titles, render title opinions, and prepare necessary security instruments. As in this case, the defendants were entitled under both federal and state law[13] to charge their borrowers for legal expenses. In a suit brought by individual attorneys, the District Court rejected the contention that the loan practice constituted a *per se* illegal tie-in of legal services, and concluded instead that no two products were involved.[14]

This conclusion, which was explicitly adopted by the Fifth Circuit in its per curiam affirmance of the District Court,[15] was premised on the finding—equally applicable here—that *the legal services were provided to the defendants, rather than to the defendants' borrowers. As such, these services were "not 'for sale' to prospective borrowers,"* but were merely "incidental" to an "arrangement . . . sanctioned by both federal regulation and by state law."[16]

■ Notwithstanding plaintiffs' protestations to the contrary, we find the analysis of the identical practice in *Forrest* persuasive.[17] As previously noted,[18] plaintiffs have not been restricted in the exercise of their right to counsel in this case. The defendant's decision to purchase legal services at a cost to plaintiffs was both legally authorized and motivated by the legitimate business concern of insuring the security of its loans. Incidental services purchased by the seller (lender) for legitimate business reasons cannot be viewed as a separate (or tied) product, merely because the buyer is charged for them.[19] This is particularly

12. 385 F.Supp. 831 (M.D.La.1973), *aff'd per curiam,* 504 F.2d 891 (5th Cir. 1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). *See also Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n,* 1974–1 Trade Cas. ¶ 74,927 (E.D.Pa.1973), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974); *Spens v. Citizens Federal Savings & Loan Ass'n,* 364 F.Supp. 1161 (N.D.Ill.1973).

13. The same federal regulation as is applicable here was involved in *Forrest.* 385 F.Supp. at 837. In addition to authorizing the charge for legal expenses, the state law in *Forrest* required the lender's attorney to certify that the property securing a loan was unencumbered. *Id.* at 836–37. Maryland law appears to contain an analogous provision. *See* Regulation 09.05.50C of the Maryland Division of Building, Savings & Loan Associations Guide. We need not decide whether the state law provisions in *Forrest* and in this case impose identical *requirements* on a lender, however, since Maryland law at least *authorizes* the defendant to charge for legal expenses. *See* p. 933 & note 24 *infra.*

14. 385 F.Supp. at 836.

15. 504 F.2d at 891.

16. 385 F.2d at 837 (emphasis added).

17. Plaintiffs have attempted to distinguish the findings in *Forrest* from the facts of this case on two grounds, both of which are spurious and unsupported by the evidence. First, relying on testimony by the defendant's president that borrowers "benefited" from the loan review services performed by the defendant's law firm, plaintiffs assert that these services were rendered to the borrowers and not to the defendant. App. Br. at 34. Not only is this testimony irrelevant to prove that the defendant's attorney acted as attorney for borrowers, it is also directly refuted by the testimony of plaintiffs' expert and of plaintiffs themselves. Their testimony conclusively demonstrates that borrowers did not purchase these legal services. *See, e. g.,* J.A. at 46–47, 64–65, 76, 86, 90, 275–76. The second purported distinction urged by plaintiffs is based on their two-fold assertion that here (unlike *Forrest*) title insurance was generally available to the defendant's borrowers, and that where title insurance is available the lender has no need of an attorney. App. Br. at 34–35. The assertion that title insurance and loan review services are alternatives ignores the fact that the function of these legal services was to examine title binders and determine which encumbrances and easements were excepted from title insurance coverage. J.A. at 270–71. The testimony in this case amply demonstrated the need for such services. *See, e. g.,* J.A. at 138–39, 149–52, 271–73.

18. *See* p. 931, *supra.*

19. *See, e. g., Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n,* 1974–1 Trade Cas. ¶ 74,-927 (E.D.Pa.1973), *cert. denied,* 419 U.S. 999,

true with respect to legal settlement services, since they represent an indispensable method of consummating the loan transaction from both the borrower's and the lender's viewpoints. Plaintiffs' argument that such services should be regarded as a tied product simply ignores the fact that the defendant has a statutory right to employ its own separate counsel to advise it and to charge the cost to its borrowers. We conclude, therefore, that no tying arrangement is involved in this loan practice.

## II. THE ALLEGED UNREASONABLE RESTRAINT OF TRADE

■ Plaintiffs' next contention is that the defendant's loan practice, though not a *per se* illegal tying arrangement, is nevertheless an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.[20] They argue that the defendant's practice unreasonably restrained competition in the market for legal settlement services by diverting borrowers exclusively to the services of the law firm retained by the defendant. Plaintiffs also assert that the practice was unreasonable in its effect because less restrictive alternatives were allegedly available to the defendant to obtain satisfactory legal settlement services.

■ Even if we assume that the arrangement between the defendant and its law firm to provide legal services on the defendant's loans may constitute a "combination" within the meaning of Section 1,[21] the record conclusively shows that the defendant's practice did not result in an unreasonable restraint on competition in the market for legal settlement services. Every member of plaintiffs' class purchased the services of an attorney other than the law firm retained by the defendant. Although many of the defendant's other borrowers employed the defendant's attorney, their decision, as much as plaintiffs', was arrived at without restriction or coercion by the defendant. Absent any showing that the defendant's borrowers were precluded from selecting their own attorneys, or that they were prevented from going elsewhere to obtain a loan,[22] we fail to perceive anything more than a *de minimis* restraint resulting from the defendant's practice. Such restraint was reasonable, moreover, since the defendant was specifically authorized by federal regulation and by state law to use its own attorney at a cost to its borrowers.

The Federal Home Loan Bank Board regulation in effect at the time of the alleged antitrust infraction expressly permitted an association to require

> the borrower to pay an initial loan charge to reimburse the institution for legal services rendered to it by an attorney selected by the institution in connection with the processing and closing of a loan.[23]

While the wording of the relevant state regulation is not as explicit as the federal provision, the state regulation also authorized the defendant to engage in this practice.[24]

---

95 S.Ct. 314, 42 L.Ed.2d 273 (1974); *Spens v. Citizens Federal Savings & Loan Ass'n,* 364 F.Supp. 1161 (N.D.Ill.1973). *See also Washington Gas Light Co. v. Virginia Electric & Power Co.,* 438 F.2d 248, 252–54 (4th Cir. 1971); *Crawford Transport Co. v. Chrysler Corp.,* 338 F.2d 934, 938–39 (6th Cir. 1964), *cert. denied,* 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965); *Nelligan v. Ford Motor Co.,* 262 F.2d 556 (4th Cir. 1959).

**20.** 15 U.S.C. § 1 (Supp. V 1975), while literally declaring every restraint of trade to be illegal, prohibits only those restraints found to be unreasonable in purpose or effect. *Standard Oil Co. v. United States,* 221 U.S. 1, 58–62, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**21.** We do not decide this issue since we find that the defendant's practice is not unreasonable in purpose or effect. .

**22.** The record reveals that borrowers selected the defendant as their lender for any one of a number of reasons, *e. g.,* because it offered a competitive interest rate, J.A. at 36–37, 59; it enabled the borrower to save money, *id.* at 74; or it was conveniently located, *id.* at 87. None of these reasons suggests that borrowers were concerned about the attorney's fee charge.

**23.** 12 C.F.R. § 563.35(c) (1975) (current version at 12 C.F.R. § 563.35(d) (1977)).

**24.** Md.Code Ann. art. 23, § 161GG (1973) provides that:

934

It is established that a business practice authorized by federal and state law ordinarily will not be held to violate the antitrust laws unless it was adopted as a result of a conspiracy among competitors.[25] Here, of course, there is no alleged conspiracy between the defendant and its competitors. Defendant's decision to charge plaintiffs for legal expenses represented nothing more than a unilateral decision on its part to do what it was legally authorized to do. Since this decision was a legitimate business judgment which occasioned at most a minimal restraint on competition, we believe the disputed practice was reasonable in purpose and effect.

Plaintiffs argue, however, that the practice was nonetheless unreasonable because the defendant's purpose in retaining counsel to insure the security of its loans could have been accomplished by less restrictive means. They advance two alternatives in support of this argument. First, relying on the fact that certain other institutional lenders did not charge their borrowers for legal expenses, plaintiffs suggest that the defendant could have retained its own attorney without requiring borrowers to pay its legal expenses. Alternatively, plaintiffs suggest that the defendant might have followed a practice of accepting loan settlements exclusively from borrowers' counsel.

In our view, the first alternative suggested by plaintiffs does not demonstrate that the defendant's practice is unreasonable.

On the contrary, the fact that the other lenders did not require a payment for legal expenses confirms that plaintiffs were free to go elsewhere if better terms of credit were offered. By charging its borrowers for legal expenses, the defendant only availed itself of a practice sanctioned by law.

Similarly, we do not consider the second alternative advanced by plaintiffs an indication that the defendant's practice is unreasonable. Prior to 1971 the defendant actually followed a practice of relying exclusively on borrowers' counsel.[26] The defendant decided to change to its present practice of retaining its own counsel because the former practice proved to be an inadequate method of obtaining legal settlement services. Many attorneys employed by borrowers were inexperienced and unqualified in the field of title examination and real estate settlements. Others proved to be less concerned with the quality of title being conveyed than with facilitating the sale.[27] Under these circumstances, the defendant's decision to retain attorneys in whom it had confidence was clearly a reasonable one, adopted after practical experience with the alternative plaintiffs suggest.

We share plaintiffs' concern that in selecting attorneys upon whom to rely the defendant might properly have chosen a group of attorneys or at least more than a

Every association may require borrowing members to pay all reasonable expenses incurred in connection with the making, closing, disbursing, extending, readjusting, releasing or renewing of real estate loans. Legal expenses incurred to consummate a loan are "reasonable," if not indispensable and required by law. See Regulation 09.05.50C of the Maryland Building, Savings & Loan Associations Guide.

25. See, e. g., Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n, 1974–1 Trade Cas. ¶ 74,-927 at 96,154 (E.D.Pa.1973), cert. denied, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). We do not intend to imply, however, that a practice which is not otherwise reasonable may be exempted from the antitrust laws merely because purportedly authorized by a state or federal regulation. "[A] state does not give

immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943); see also Otter Tail Power Co. v. United States, 410 U.S. 366, 372–74, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). We rely on the cited regulations only as further evidence that the defendant's practice was unmotivated by an anticompetitive purpose.

26. Under its prior practice, the defendant accepted settlements prepared by any attorney having the highest rating by Martindale-Hubbell. J.A. at 332–35.

27. See, e. g., J.A. at 177–85, 271, 332, 329–30, 334–35.

single law firm.[28] But we believe the defendant's failure to do so amounted on this record to a legitimate exercise of business judgment that is outside the scope of the antitrust laws. The defendant makes loans to borrowers having diverse interests and differing needs for legal services.[29] To require an assessment of those interests and needs, and in turn an examination of the qualifications and competency of counsel to conduct loan settlements, would be to impose an unreasonable burden upon the defendant. The antitrust laws do not require the defendant to set up the board of surrogate law examiners that would inevitably be required to implement the plaintiffs' alternative.

We also note that the defendant's present practice which permits borrowers to use virtually any member of the Maryland bar is in several respects less restrictive than the alternative suggested by plaintiffs. Many attorneys who are proficient in real estate law would necessarily be excluded under plaintiffs' alternative.[30] In addition, since borrowers frequently select counsel for reasons other than those strictly relating to the attorney's qualifications in the field of real estate settlements,[31] it is likely that the criteria employed by the defendant to approve borrowers' counsel would in some instances result in the exclusion of borrowers' preferred counsel. A practice of relying exclusively on borrowers' counsel might not, therefore, be materially less restrictive from either the borrowers' or the defendant's viewpoint.

In short, we find that the alternatives proposed by plaintiffs offer no indication that the defendant's practice unduly restrained competition in the market for legal settlement services. While we recognize that under other circumstances this practice might be anticompetitive in purpose or effect,[32] those circumstances are not present here. The defendant's loan practice was instituted solely for a legitimate business purpose, and fully comports with plaintiffs' right to counsel and the defendant's statutory right to charge borrowers for incidental legal expenses. Viewed in the circumstances disclosed by the record, the challenged practice does not violate the antitrust laws.

*Affirmed.*

LEVENTHAL, Circuit Judge, concurring:

I concur in the result and the reasoning of the majority opinion. I add a word to note the problem, and it is a real problem as I see it, that an association may well, through its president or other managing official, be engaged in a combination in fact to "steer" legal business to its counsel (who

---

**28.** The defendant retained the Maryland law firm of Lancaster, Bland, Eisele & Herring. Several of the name partners of this firm have held, and continue to hold, high corporate positions in the defendant association, and one serves as its general counsel. We do not address the propriety of the defendant's decision to retain this law firm under any legal standard governing the defendant's business conduct other than that provided by the antitrust laws.

**29.** The differing legal needs of borrowers are exemplified by two of the named plaintiffs in this case. The title binder issued to them contained four separate exceptions which jeopardized the security of title to their property. J.A. at 138–44. We note that, as a practical matter, the defendant must retain its own counsel for loans like those made to these plaintiffs, since, owing to lack of privity, the lender may have no recourse against borrowers' counsel for negligent certification of title.

See, e. g., *Anderson v. Boone County Abstract Co.*, 418 S.W.2d 123 (S.Ct.Mo.1967) (*en banc*).

**30.** Qualified attorneys were in fact excluded under the defendant's prior practice. J.A. at 329–30, 334–35.

**31.** Indeed, one reason for the defendant's decision to institute the practice of retaining its own counsel was its dissatisfaction with inexperienced attorneys selected by borrowers. See J.A. at 271–73.

**32.** For example, if a lender precluded its borrowers from selecting their own counsel, its designation of settlement attorneys would likely be anticompetitive and tend to inflate settlement costs. The defendant in this case, however, has not imposed any restriction on its borrowers' right to counsel.

may have business or personal ties with management, or both).

If a borrower must pay extra out of his own pocket when he hires another lawyer, but has no additional payment to make if he hires lawyer X, there is likely some steering of trade, and that is a "restraint."[1]

Where plaintiff fails in this case is that he made no tender of facts that such steering as takes place has been venally motivated. And there is a justification for the system developed in defendant's institution —namely, (1) It wants its own counsel Mr. X (for its own protection); (2) It is willing to waive retainer of Mr. X when plaintiff has already hired him, thus avoiding either waste, or a double fee to Mr. X for doing the same work.

The combination of justification in terms of saving to the borrower plus lack of any showing of venality in the circumstances warrants a finding as a matter of law that there has been no showing of an unreasonable restraint of trade.

If the defendant's loan practice were not "instituted solely for a legitimate business purpose," but rather from venal motivations, I think that practice quite possibly could be found "anticompetitive in purpose."[2] Judge Wilkey has authorized me to state that he joins in this opinion, and in its conclusion that the matter is open if another record makes a tender of venality.[3]

MacKINNON, Circuit Judge:

I concur in the opinions by Judge Wilkey and Judge Leventhal.

---

1. Nor is the possibility disproved on the ground that in any event the association would have this work done by X. Management may hesitate to insist on a particular counsel, as against the possible outcry from members or shareholders, if the annual report shows a very large sum paid to this lawyer by the association. But if a large part of that lawyer's income is recorded on his books as payments by a number of borrowers, and does not appear at all— either on his books or the association's—as a fee attributable to the association, that stills any possibility of embarrassing inquiry.

 The matter would be completely set at rest, of course, if the association adopted the suggestion of the majority opinion and chose a group of attorneys for this work.

2. Maj. op. at 935.

3. The leading opinion on reasonableness is flavored with intimations of bribery. *Standard Oil Company of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

 In seeking rehearing, plaintiffs-appellants put it that this concurring opinion carves out new ground, which they should have opportunity to explore, that they had properly been proceeding on the theory that the antitrust laws are concerned with effects of conduct, not intent or laudable purpose, citing Sullivan, *Antitrust* (West Pub. St. Paul 1976) at 194, and that the existence of intent as an element in a criminal antitrust offense, such as was involved in *Standard Oil,* is not applicable in civil cases which remain governed by "the general rule that a civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *United States v. United States Gypsum Co.,* —— U.S. ——, —— n.13, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854. In *Gypsum* Chief Justice Burger goes on to say: "Of course,

considerations of intent may play an important role in divining the actual nature and effect of the alleged anticompetitive conduct. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Thus cited is pertinent observation of Justice Brandeis (246 U.S. at 238, 38 S.Ct. at 244):

 But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

 It is hardly new law to say that context and purpose guide in determining whether the agreement or practice under consideration goes beyond the quality of incidental restraint, a familiar and not forbidden occurrence, and takes on the color of an unreasonable restraint, with a predominantly anticompetitive character.