# GREENBELT HOMES, INC. *v.* NYMAN REALTY, INC.
## ET AL.

[No. 176, September Term, 1980.]

*Decided March 4, 1981.*

The cause was argued before MORTON, THOMPSON and MacDANIEL, JJ.

*Albert Ginsberg,* with whom were *Elizabeth H. Farquhar* and *Schneider & Ginsberg* on the brief, for appellant.

*Abraham Chasanow,* with whom was *William F. Edwards* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

## I FACTS

Greenbelt Homes, Inc. (GHI), the appellant and cross-appellee, is a cooperative housing development of some 1600 units located in Greenbelt, Maryland. All but a few of the houses were built by the federal government during the 1930's and 1940's; GHI, which is a non-profit, non-stock Maryland corporation, acquired the property and began operating in 1952. GHI retains legal title to the land and buildings, pays the taxes and insurance, and supplies maintenance and various other services. Funds for these services are obtained through monthly operating payments made by each member-owner. Through a mutual ownership contract, which is similar to a proprietary lease, *see, Green v. Greenbelt Homes,* 232 Md. 496, 194 A.2d 273 (1963), each member-owner of the cooperative acquires from the corporation a right of perpetual use and enjoyment in his or her

house. Under the contract, each household is also entitled to one vote in corporate affairs. GHI calls itself a "conversion" co-op and is said to be unique in that co-op members may sell the interest which they hold in their houses at market value to any buyer whom the co-op will approve for membership. The exercise of this right is not without restriction; e.g., GHI has a right of first refusal on all sales and a member is not permitted to sell his interest at a profit until he has lived in the co-op for at least two years. GHI is also a licensed real estate broker and operates a sales office for the listing and sale of GHI houses.

Nyman Realty, Inc. (Nyman), one of the appellees and cross-appellants, is a real estate agency located in Greenbelt and the successor in interest to Greenbelt Realty Company. Although Nyman bought Greenbelt Realty on January 1, 1977, it continued to operate the business under the name "Greenbelt Realty" until January 1, 1978, when the name was changed to "Nyman." Nyman has six offices in addition to the one located in Greenbelt and is a member of both a national and a county listing organization. It deals in a variety of types of properties, including houses located in the GHI cooperative. At trial, the evidence showed that, at least since the early 1970's, Nyman and its predecessor have each year listed and sold more GHI houses than any other single agency.

Eric Wade Barber and Marshal A. Gielen, two of the appellees and cross-appellants, are real estate agents employed by Nyman and member-owners of GHI. Both earn substantial portions of their income from commissions on the sale of GHI houses. At the time of trial, Barber had contracted to sell his co-op house but had not yet settled; Gielen had listed her house for sale but had not yet obtained a buyer.

A GHI member-owner who wishes to sell his interest in his house can do so in one of three ways: (1) he can act as his own agent; (2) he can list with any licensed real estate agency; or (3) he can list with the sales office operated by GHI. Prior to June 1, 1978, upon completion of a sale, the selling member

paid GHI an administrative fee of $150 and an inspection fee of $65. These fees were intended to cover GHI's costs in screening the proposed buyer, educating the buyer concerning his rights and obligations as a GHI member, completing the paperwork required to transfer the interest, and conducting a physical inspection of the house. If the selling member listed and sold his house through the GHI· sales office, GHI charged a 5-½% commission, approximately $1100 on the average house, but waived the administrative fee.

On June 1, 1978, a reorganization of the GHI sales service, which had been approved by the GHI Board of Directors on January 12, 1978, became effective. This reorganization, which involved expansion of the sales staff, resulted in a significant change in the fees charged members who sold their co-op houses. The $65 inspection fee, previously charged on all sales, was abolished. The 5-½% commission, previously charged those members who sold through the GHI sales office, was also abolished. The $150 administrative fee, previously charged on all sales but waived where GHI was paid a commission, was increased to $550 and charged to all sellers, regardless of whether or not they used the GHI sales service. The services of the sales staff were made available to all sellers without a separate charge. Testimony at trial indicated that the increased administrative fee was intended to cover the costs of all of the services for which the charges had previously been separate, i.e., screening, educating, completing paperwork, inspecting, and maintaining the sales office. GHI arrived at the figure of $550 by adding the costs of providing the services previously covered by the old administrative and inspection fees to the costs of operating the expanded sales office, a total of approximately $110,000 annually, and dividing that total by the number of houses transferred in an average year, approximately 200. Thus, GHI took two separate operations which, prior to the reorganization, were separately funded; merged them; and began levying a single charge which covered the costs of both operations. The principal economic effect of the reorganization was to compel all sellers to pay

to support the sales office, whereas previously only those sellers who utilized its services had had to pay for its support. This created, and was obviously intended to create, an economic incentive for all selling members to list their houses with the GHI sales office.

## II PLEADINGS

On May 24, 1978, one week prior to the effective date of the GHI reorganization, Nyman filed a bill of complaint in the Circuit Court for Prince George's County. The bill of complaint was subsequently amended and Barber and Gielen joined in the action as plaintiffs. As amended, the bill alleged that the combination by GHI of its administrative, inspection, and sales services in a single operation and the levying of a single mandatory charge covering the costs of the combined services violated the Maryland Antitrust Act (the Act), Md. Com. Law Code Ann. §§ 11-201 *et seq.,* and was also *ultra vires.* Nyman, Barber and Gielen claimed that they had lost listings, sales, and commissions as the result of GHI's combination, because selling members, who were compelled to pay for the GHI sales service whether they used it or not, were choosing to list their co-op houses with GHI, rather than with brokers such as Nyman. Pursuant to §§ 11-209 (b) (2) and 11-209 (b) (4) of the Act, the amended bill sought an injunction, treble damages, costs, and attorney's fees.

## III PROCEEDINGS

At trial, the chancellor found that GHI, by its combination of services and fees, had created a tie-in which was unreasonable *per se* and thus a violation of § 11-204 (a) (1) of the Act.[1] He also found that the imposition of the $550 administrative fee was *ultra vires,* although he held that the old administrative and inspection fees totaling $215, which

---

1. Section 11-204 (a) (1) provides: "A person may not: By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce."

were charged prior to the reorganization, were not. Evidence presented at trial showed that, beginning at least five months prior to the effective date of the GHI reorganization, the number of GHI members listing their co-op houses for sale with Nyman had declined, with a corresponding decline in commissions earned by Nyman and its agents; the chancellor found that this decline had been caused by the loss of goodwill which accompanied Nyman's name change on January 1, 1978 and by a lack of available finance money. The chancellor therefore held that Nyman, Barber, and Gielen had failed to prove that they had lost commissions as a result of the tie-in. Barber, who had contracted to sell his co-op house and who had paid GHI the administrative fee of $550, was found to have suffered damages in the amount of $335, that figure representing the difference between the $550 fee charged and the "justified charges" of $215.

On the basis of these findings, the chancellor issued an order, dated January 4, 1980, in which he enjoined GHI from charging its members an administrative fee which combined the costs of its sales service with its administration and inspection costs, from offering its sales service to its member-owners on other than an optional basis, and from subsidizing its real estate sales service with funds derived from any mandatory fees charged member-owners. In his order, the chancellor also awarded Barber damages of $1,005, i.e., three times his actual damages of $335, and ordered GHI to segregate the bookkeeping for its sales service from that of its other operations.

Both sides have appealed the chancellor's order. GHI contends that the chancellor's findings that the imposition of the combined fee was a restraint of trade in violation of § 11-204 (a) (1) and also *ultra vires* are not supported by the evidence. Nyman, Barber, and Gielen assert that the chancellor committed error in refusing to award damages for lost commissions; they argue in addition that the chancellor erred in finding that only a portion of the administrative fee was *ultra vires;* and he erred in denying attorney's fees.

48

## IV THE LAW

In interpreting the Maryland Antitrust Act, we are to be guided, but not bound, by the construction given the analogous federal statutes by the federal courts. Md. Com. Law Code Ann. § 11-202 (a) (2); *Quality Discount Tires v. Firestone Tire,* 282 Md. 7, 12, 382 A.2d 867 (1978); *Cities Service Oil v. Burch,* 29 Md. App. 430, 436, 349 A.2d 279 (1975). The analogue under the federal statutes to § 11-204 (a) (1) is Section 1 of the Sherman Act, 15 U.S.C. § 1.[2] *See, Quality Discount Tires v. Firestone Tire,* 282 Md. at 11.

It has been held that a tie-in, defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier," *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5-6, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958), constitutes a contract in restraint of trade which may be barred by § 1. *See, Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969); *Northern Pacific Railway Co. v. United States, supra; International Salt Company v. United States,* 332 U.S. 392, 68 S. Ct. 12, 92 L. Ed. 20 (1947). It has also been held that, under § 1, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States,* 356 U.S. at 5. Where certain prerequisites exist, tie-ins are among the practices which are unreasonable *per se. Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. at 498. Those prerequisites are: "The fact of a tying agreement, the affecting of a 'not

---

**2.** 15 U.S.C. § 1 provides: "Every contract, combination . . . , or conspiracy, in restraint of trade or commerce . . . is declared to be illegal . . . ." Although the section does not expressly state that it bars only those practices which "unreasonably" restrain trade, the federal courts have so construed it. Quality Discount Tires v. Firestone Tire, 282 Md. at 12-13 n.3; *see,* Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed 619 (1911).

insubstantial' amount of interstate commerce, and sufficient economic power in the market for the tying product for the seller to restrain competition in the market for the tied product." *Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 628 (4th Cir. 1979), *cert. denied,* 444 U.S. 1072 (1980). *See, Fortner Enterprises, Inc. v. United States Steel Corp., supra.* Thus, in *Northern Pacific Railway Co. v. United States, supra,* where the defendant had sold or leased land on the condition that all goods produced or manufactured on that land be shipped on defendant's railroad, provided that its services and rates were equal to those of competing carriers, the Court found that the defendant had tied together two normally separate items, i.e., the land which was sold or leased and its rail services; that the defendant had substantial economic power, by virtue of its extensive land holdings, which it used to obtain the preferential routing clauses in the contracts and leases; and, that a not insubstantial amount of commerce was affected by the practice. The Court held that this tie-in was unreasonable *per se.* Similarly, in *Fortner Enterprises, Inc. v. United States Steel Corp., supra,* the Court found evidence of a tie-in which was unreasonable *per se* where the defendant had made loans, through a subsidiary, to housing developers, for the purchase and development of land, which were conditioned upon the developers' agreeing to purchase and erect upon the land prefabricated houses manufactured by the defendant. The significance of finding a tie-in or other practice to be unreasonable *per se* is that it obviates the necessity for a specific showing of the practice's unreasonable effect on competition. *Id.,* 394 U.S. at 498. It has also been held that a finding of *per se* unreasonableness precludes the defendant from demonstrating that the practice is reasonable in operation. *See, AAMCO Automatic Transmissions, Inc. v. Tayloe,* 407 F. Supp. 430 (E.D. Pa. 1976). It should be noted that not all tie-ins are unreasonable *per se. See, White Motor Company v. United States,* 372 U.S. 253, 262, 83 S. Ct. 696, 9 L. Ed. 2d 738 (1963). Even where a tie-in cannot be held to be unreasonable *per se,* because one or more of the prerequisites to such a finding is absent, the practice may

nonetheless be found to be unreasonable and thus illegal under section 1, "whenever [the plaintiff] can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. at 500.

## V APPLICATION OF THE LAW

Turning to the facts of the case at bar, we agree with the chancellor's finding that the combination by GHI of its administrative and sales services under the mandatory administrative fee was a tie-in which was unreasonable *per se* and an unreasonable restraint of trade under § 11-204 (a) (1).[3] It is clear that GHI linked two normally separate items in such a manner that the tying service, i.e., the administrative and inspection services, could not be purchased from GHI without also buying the tied service, i.e., the real estate sales service. The tied service is not one which is merely incidental or ancillary to the tying service, as is, for example, "free" delivery service provided by a department store for merchandise. *See, Fortner Enterprises v. United States Steel Corp.*, 394 U.S. at 525 (Fortas, J., dissenting); *Foster v. Maryland State Savings and Loan Association*, 191 U.S. App. D.C. 226, 590 F.2d 928 (1978), *cert. denied*, 439 U.S. 1071 (1979). The essential characteristic of a tie-in is the use of the economic power which one party has over the supply of the tying product to induce another party to purchase a tied product which otherwise could not be sold as successfully, because of the tied product's price or quality relative to competing products on the market. *See, Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 611, 73 S. Ct. 872, 97 L. Ed. 1277 (1953); *cf., Cities Service Oil v. Burch, supra* (Oil company alleged to have used economic power over supply of gasoline to compel its dealers

---

3. Tie-ins may also be prohibited under § 11-204 (a) (6) of the Act. The chancellor held that, under the circumstances presented here, this section was inapplicable. The validity of that decision is not an issue in this appeal.

to purchase various accessory products from it and designated suppliers.) This characteristic is present here, where GHI sought to sell its sales service to its members by utilizing the complete control which it had over the supply of its administrative and inspection services; services which the members had to buy in order to sell their co-op houses. We agree with the chancellor's determination that this practice constituted a tie-in. The chancellor found, and we also agree, that GHI had sufficient economic power in the market for the tying services to appreciably restrain competition in the market for the tied service. GHI was the exclusive source of the administrative and inspection services without which a member could not sell his house. Such uniqueness and exclusiveness confers economic power. *See, United States v. Lowe's, Inc.,* 371 U.S. 38, 45, 83 S. Ct. 97, 9 L. Ed. 2d 11 (1962); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 49-50 (9th Cir. 1971), *cert. denied,* 405 U.S. 955 (1972). Here, it is clear that GHI had "the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to [an] appreciable number of buyers within the market." *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. at 504. This is sufficient economic power to satisfy the second element of *per se* unreasonableness. We also find that the chancellor was correct in his determination that the amount of commerce affected by the tie-in is not insubstantial. In *Fortner Enterprises, Inc. v. United States Steel Corp., supra,* the Court stated: "For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, . . . the relevant figure is the total volume of sales tied by the sales policy under challenge. . . ." 394 U.S. at 502. In its opinion, the Court indicated that it did not consider the sum of $190,000 to be insubstantial. *Id.,* 394 U.S. at 502. In *AAMCO Automatic Transmissions, Inc. v. Tayloe,* 407 F. Supp. at 436, the Court stated that sales of $50,000 could not be considered insignificant under *Fortner Enterprises.* In the case at bar, it was testified that approximately 200 co-op units were transferred annually. As the chancellor found that $215 of the $550 administrative fee was properly attributed to

administration and inspection and was justified the tied sale on each co-op transferred was $335. The annual volume of tied sales was thus approximately $67,000. In addition, the tie-in each year affected the sale of more than four million dollars worth of property. This is substantial commerce.

## VI CONTENTIONS

(a) GHI argues at some length that the instant case is "substantially identical" to that of Foster v. Maryland State Savings and Loan Association, supra, where a savings and loan association required mortgage borrowers to pay, as a cost of obtaining the loan, an attorney's fee to cover the cost of having the association's counsel prepare the mortgage and examine title. Borrowers were free to employ counsel of their own choosing to perform these same functions on their behalf; but, the lender waived payment of the fee if the borrower chose to use the law firm selected by the lender and paid the firm for its services directly. It was alleged that this practice was an illegal tie-in of legal services to the sale of credit and an unreasonable restraint of trade. The D.C. Circuit held that the practice was legal. Finding that the legal services purchased were being provided to the lender, the Court held that, although charged separately, the services were an "incidental and inseparable part" of the purchase of the loan and not a tied product or service. As an essential element of a tie-in is the existence of two separate products or services, see, Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. at 507, the Court found that no tie-in existed. Accord, Forrest v. Capital Building & Loan Association, 385 F. Supp. 831 (M.D. La. 1973), aff'd, 504 F.2d 891 (5th Cir. 1974), cert. denied, 421 U.S. 978 (1975). The Court also found that, because the practice was authorized by federal and state regulations and the lender had a right to protect its interest by insisting that the loan documents be prepared by counsel in whom it had confidence, any restraint of trade imposed was not unreasonable. GHI would have us find its practice analogous to that in Foster. We find that it is not. The practice challenged in Foster was found to

constitute the sale of but one product or service, i.e., credit; as we stated in our discussion above, GHI has tied together two distinct products or services. Furthermore, the practice employed in *Foster* was found to have legitimate business justifications; GHI's does not. In his opinion, the chancellor stated:

"GHI argues that its tie-in is based on legitimate business justifications. It contends that it wants to handle the sales itself to avoid misrepresentations and misconceptions regarding the nature of the real property interests being purchased and the nature and policies of the cooperative.

"This Court finds no legitimate business justification for the tie-in. In its screening and educating processes GHI can, and apparently does, apprise the prospective purchaser of the rights and obligations between member-owners and the cooperative. GHI can quite properly assess its selling member-owners to support screening and educating new members. The sales contracts are contingent on GHI's approval. GHI can protect itself, its goodwill and its member-owners without the tie-in. GHI failed to prove that its real estate sales office was necessary or even helpful in the screening and educating processes. (Selling and screening could conflict rather than complement each other.)

"Additionally, GHI did not make itself the exclusive agent for the sale of the member-owner's interest. Its intention was not to control outside agents but rather to establish a beachhead for itself in the real estate sales service market."

*Foster v. Maryland State Savings & Loan Association* is thus distinguishable from the case at bar.

(b) GHI also contends that, in order to set forth a cause of action under the Act, there must be a showing that the alleged violation has caused some injury to the general public. Under its theory, where the only specific injury proved

is economic injury suffered by the plaintiffs as individuals, no cause of action will lie. Again, we do not agree. The Act provides: "A person whose business or property has been injured or threatened with injury by a violation of § 11-204 may maintain an action for damages or for an injunction or both against any person who has committed the violation." Md. Com. Law Code Ann. § 11-209 (b) (2). Absent from this section is any suggestion that injury to the general public is an element of a cause of action under the Act. *See,* Reynolds and Wright, *A Practitioner's Guide To The Maryland Antitrust Act,* 36 Md. L. Rev. 323, 347 (1976). In *Quality Discount Tires v. Firestone Tire, supra,* the Court of Appeals discussed at considerable length the elements which a plaintiff in a private antitrust action must allege and prove to recover under § 11-204 (a) (1) of the Act. Absent from the elements listed was any requirement of public injury. *Id.,* 282 Md. at 119-22. The Supreme Court has rejected the contention that there exists such a requirement under the federal statute. In *Radiant Burners, Inc. v. Peoples Gas Light and Coke,* 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961), the Court, quoting from its opinion in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959), stated: "The alleged [violation of 15 U.S.C. § 1] 'interferes with the natural flow of interstate commerce [and] clearly has . . . "a monopolistic tendency." As such it is not to be tolerated merely because the victim is just one [manufacturer] whose business is so small that his destruction makes little difference to the economy.'" 364 U.S. at 660. *See also,* Reynolds and Wright, 36 Md. L. Rev. at 347, n. 170. We hold that a showing of injury to the general public is not an element of a cause of action under the Act. Language such as that contained in *Grempler v. Multiple Listing Bureau,* 258 Md. 419, 430, 266 A.2d 1 (1970) ("[T]he purpose of the anti-trust . . . laws is to protect the public by healthy competition, not primarily to protect individual plaintiffs."), *see also,* Md. Com. Law Code Ann. § 11-202 (b) (2) (i) (Act not to be construed to prohibit "act or practices . . . which are not injurious to the public interest"), merely states a truism; i.e., that antitrust and similar

laws have as their intended purpose the protection of the public. *See,* Md. Com. Law Code Ann. § 11-202 (a) ("the purpose of this subtitle is to complement the body of federal law . . . in order to protect the public . . . ."). The legislature has chosen to achieve that purpose in part by authorizing suits under the Act by individuals harmed by its violation. As the Supreme Court noted in *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. at 502: "Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition." Thus, we do not regard the general purpose of the Act as imposing requirements in addition to those expressly set forth under § 11-209 (b) (2).

(c) The chancellor refused to award the cross-appellants damages for lost commissions, stating:

> "This court finds that the plaintiffs failed to demonstrate that their losses in real estate sales commissions resulted from GHI's tie-in. The loss of goodwill subsequent to the plaintiff's name change to 'Nyman Realty,' coupled with the relative inaccessibility of financing due to tightening of the money market were largely responsible for the drop in commissions. Loss of listings cannot be measured in damages since, although it was asserted that listings were valuable, no specific value was testified to or demonstrated. It has not been proved with reasonable certainty that the tie-in resulted in a loss of sales commissions."

In their cross-appeal, Nyman, Barber, and Gielen contend that the chancellor's finding was contrary to the evidence. Although the Court of Appeals, in *Quality Discount Tires v. Firestone Tire, supra,* referred to the relaxed standards of proof employed in antitrust actions with regard to causation and the amount of damages, 282 Md. at 23-24, it also noted that *"the fact that* [the plaintiff] *has been damaged in some degree,"* 282 Md. at 23 (emphasis in original), must be proved with "reasonable certainty," and stated that the fact

finder "must not be forced into pure speculation and guesswork." 282 Md. at 25. In the instant case, the chancellor's comments from the bench, as well as the language which he used in his opinion, show that he was cognizant of the *Quality Discount Tires* decision and its import. We find no basis for concluding that he held the cross-appellants to a standard of proof which was more stringent or restrictive than that sanctioned by the Court of Appeals. Inasmuch as there was some evidence presented at trial which supports, either directly or by inference, the chancellor's conclusions as to damages, he was not clearly erroneous. Md. Rule 1086.

(d) As we noted above, the chancellor held that the imposition by GHI of the $550 administrative fee was *ultra vires,* but that GHI could legally charge the selling members for the cost of performing those functions which had been covered under the old administrative and inspection fees. In his opinion, the chancellor based his holding that the combined fee was *ultra vires* upon Art. VIII, § 2 of the corporate by-laws, which provides that GHI "shall not have the authority to assess its members . . ."; the opinion does not explain why the chancellor concluded that GHI was not also barred under this section from assessing its members an inspection fee and an administrative fee which did not include the cost of the sales office. On this appeal, both sides argue that the chancellor's holding is logically inconsistent. GHI contends that, if the by-laws do not bar it from assessing its selling members administrative and inspection fees, the by-laws do not bar it from assessing the members an administrative fee which includes the cost of the sales service. Nyman, Barber, and Gielen contend that, if the assessment of the $550 fee is prohibited, the assessment of a lesser fee must also be prohibited. Both sides would have this Court interpret the language of the corporate by-laws and determine whether the imposition of either the old or the new fee is permissible. We do not reach the question.

In *Poole v. Miller,* 211 Md. 448, 128 A.2d 607 (1957), it was alleged that the making of certain mortgage loans by a corportion violated its by-laws. Without reaching the question of

whether the by-laws had in fact been violated, the Court concluded that, because it was a matter of business necessity that the corporation make loans the terms of which did not conform to its by-laws, the by-law provision involved "had been waived or repealed by acquiescence." 211 Md. at 456. The Court quoted Machen, *Modern Law of Corporations,* § 727, as follows:

> "We have seen above that custom may have the force of a by-law; and a necessary corollary of that proposition is that a similar custom may also repeal a by-law. Consequently, long-continued disregard of the provisions of a by-law may be equivalent to an express repeal. Even a by-law which has been formally adopted may lapse or be repealed by desuetude." 211 Md. at 456.

*See also,* W. Fletcher, *Cyclopedia of the Law of Private Corporations,* §§ 4183, 4200 (rev. perm. ed. 1966). In the case at bar, GHI has charged selling members an administrative fee since 1967. If the levying of this charge is prohibited by a provision contained in the by-laws, that long-ignored provision, like that in *Poole,* has "been waived or repealed by acquiescence." Thus, we need not consider whether Art. VIII, § 2 of GHI's by-laws, which the chancellor held barred the imposition of the $550 fee, bars the imposition of an administrative fee of a lesser amount, as Nyman, Barber, and Gielen contend. Similarly, as we have upheld the injunction issued and the award of damages to Barber based on the violation of the Antitrust Act, a reversal of the finding of *ultra vires* [4] would have no effect on the order issued and we need not address GHI's contention either.

(e) The cross-appellants contend that the chancellor erred in failing to award reasonable attorney's fees. Section 11-209

---

**4.** We note the apparent misapplication here of the term *ultra vires.* An *ultra vires* act "is one not within the express or implied powers of the corporation as fixed by its charter, the statutes, or the common law." Fletcher § 3399 (rev. perm. ed. 1978). As by-laws "are essentially separate and distinct from, and form no part of, the corporation's charter." *id.* at § 4167 (rev. perm. ed. 1966), "[b]y-laws cannot make an act ultra vires. . . ." *Id.* at § 3436 (rev. perm. ed. 1978).

(b) (3) of the Act provides: "If an injunction is issued, the complainant shall be awarded costs and reasonable attorney's fees." Section 11-209 (b) (4) provides: "In an action for damages, if an injury due to a violation of § 11-204 is found, the person injured shall be awarded . . . costs and reasonable attorney's fees." The statutory language is mandatory. *See, Pope v. Secretary of Personnel,* 46 Md. App. 716, 420 A.2d 1017 (1980). Thus, the chancellor was required to determine and award reasonable attorney's fees to all appellees because he awarded an injunction to all of the appellees as well as damages to Barber. We will remand this case so that he may do so.

> *Decree affirmed in part, reversed in part.*
>
> *Case remanded for determination of attorney's fees and costs and entry of appropriate decree.*
>
> *Greenbelt Homes, Inc. to pay costs.*