*Diane Steele v. Diamond Farm Homes Corp.*, No. 59, September Term 2018, Opinion by Hotten, J.

**HOMEOWNER'S ASSOCIATIONS – UNPAID ASSESSMENTS – ULTRA VIRES DEFENSE –** The Court of Appeals concluded that Petitioner's assertion of an offset against Respondent's claim for nonpayment of dues was rooted in the premise that the Homeowner's Association ("Association") lacked the power or capacity to raise assessment dues in a manner that abrogated an express provision in the Association's Declaration of Covenants, Conditions and Restrictions. The Court held that the assertion the Association lacked power or capacity was embedded in the guidelines for bringing ultra vires claims, codified in Md. Code, Corporations and Associations § 1-403. Because the statute has specific criteria for bringing ultra vires claims that Petitioner failed to observe, the Court held that Petitioner's defense of an offset was precluded.

**HOMEOWNER'S ASSOCIATIONS – UNPAID ASSESSMENTS – EQUITABLE ESTOPPEL –** The Court of Appeals held that Petitioner's assertions regarding an offset in dues was precluded based on the doctrine of equitable estoppel. The Court concluded that the Association had relied upon Petitioner's voluntary conduct in good faith to its detriment.

**ATTORNEY'S FEES – REASONABLENESS –** The Court of Appeals held that the circuit court did not abuse its discretion in awarding attorney's fees in the amount of $4,200. The circuit court properly considered a witness's oral testimony regarding reasonable attorney's fees, weighed factors for reasonableness as described in Maryland Rule 2-703(f)(3), and analyzed this Court's precedent in *Monmouth Meadows Homeowner's Ass'n v. Hamilton*, 416 Md. 325, 7 A.3d 1 (2010). As a result of its thoughtful review, the circuit court reduced the request of $26,589.13 in attorney's fees to $4,200. This figure was reasonable and did not amount to an abuse of discretion.

Circuit Court for Montgomery County
Case No. 9777D
Argued: February 28, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 59

September Term, 2018

_____

DIANE STEELE

v.

DIAMOND FARM HOMES CORP.

_____

Barbera, C.J.,
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Hotten, J.
McDonald and Adkins, JJ., concur.

_____

Filed: June 26, 2019

Petitioner, Diane Steele ("Steele"), owned a home in the Diamond Farm development of Montgomery County, which was managed by a homeowner's association ("Association"). In accordance with the Association's Declaration of Covenants, Conditions and Restrictions ("Declaration"), the Association must obtain at least two-thirds of the total votes of all classes of members voting in person or by proxy to increase annual assessments. Through a letter dated September 19, 2016, Steele discovered that assessment increases in 2007, 2011, and 2014 did not receive the requisite two-thirds vote for approval. As a result, Steele calculated her overpayment in assessment dues, determined that she was entitled to an offset, and ceased making payments. The Association noted Steele's payment delinquency in October 2016 and brought suit against her in the District Court located in Montgomery County regarding the unpaid assessments and attorney's fees. Thereafter, the District Court entered judgment in Steele's favor because the Association had failed to establish the amount of dues owed. The Association subsequently noted a *de novo* appeal to the Circuit Court for Montgomery County, which ruled in favor of the Association. Steele appealed and this Court granted *certiorari*. The following questions are presented for review:

1. Was [Steele's] defense to a suit for [Association] dues, that she did not owe dues for the amounts of increases imposed without the supermajority required under the Declaration of Covenants, invalid due to [a statute restricting the use of the] ultra vires [defense,] or laches?

2. Did the [circuit] court err and abuse its discretion with an award of attorney['s] fees against [Steele], since [the Association] submitted no affidavit, lost in [D]istrict [C]ourt, and the principal recovered was less than one third of the awarded attorney['s] fees?

For reasons discussed *infra*, we affirm the circuit court's judgment of $1,257.60 in assessment fees, plus $4,200 in attorney's fees.

**BACKGROUND**

1. Factual Background

In 1969, the Association recorded its Declaration, establishing a homeowner's association for a number of single-family homes in Gaithersburg, Maryland. The Declaration reflects an annual assessment maximum of $150 per year, which can be increased with the assent of two-thirds of the homeowners. The relevant provision of the Declaration, Article V, § 5, states as follows:

> The basis and maximum of the annual assessments provided for in Section 3 above may be changed by the assent of two-thirds (2/3) of the total votes of all classes of Members voting in person or by proxy at a meeting duly called for that purpose and written notice of such meeting shall be sent to all Members at least thirty (30) days in advance and shall set forth the purpose of the meeting.

In 2003, 2007, 2011, and 2014, the Association increased the assessment. In 2003, the assessment increased to $720 per year, or $180 per quarter.[1] Ninety-four homeowners voted in favor of the increase and thirty-eight homeowners voted against it, representing the requisite two-thirds required for an increase. The Association disclosed the results of that vote in a newsletter sent to homeowners. The letter specified that "[o]f the 132 total votes, 94 homeowners voted "Yes" and 38 voted "No." **A minimum of 81 votes were**

---

[1] Beginning with the July 2003 assessment, the Association "returned" to quarterly payments. However, we have represented the assessment in both quarterly and yearly values.

**needed for the election to be binding, and two-thirds of the total must be "Yes" votes for the increase to be approved**." (emphasis added).

Subsequent letters that notified homeowners of increases did not specify that a two-thirds majority had been achieved. In February 2007, at a special meeting of the homeowners, the assessment was increased to $800 per year, or $200 per quarter. The Association disclosed the increase in a letter to homeowners, dated February 27, 2007, which specified that "[o]f the 90 proxies received[,] 57 voted for the increase and 33 against." The 2011 increase raised the assessment to $880 per year, or $220 per quarter, and the increase was again disclosed in a letter to homeowners. Nothing in the letter specified the vote count either for or against the increase. The most recent increase in 2014, which occurred by vote at a January 22 board meeting, raised the assessment to its current level of $960 per year, or $240 per quarter. The Association notified homeowners by letter without reference to the vote count.

In 2015 or 2016, the Board President asked Larry Lucas ("Lucas"), an Association homeowner who had previously been involved with the Association's Board, "to help clean up some of the records[.]" During his inspection of past records, Lucas noted that the results for elections to raise the annual assessment in 2007, 2011, and 2014 did not receive the two-thirds majority required by the Declaration. Lucas wrote a letter explaining these details, gave it to the Board members in September 2016, and later mailed the letter to

3

every member of the Association and every homeowner.[2]  Lucas's letter revealed that the last proper dues increase was in 2003.

Steele purchased a house in the Diamond Farm development in 1994.  She became aware of the irregularity in past dues increases when she received Lucas's letter and calculated her overpayment in dues.  Based on her overpayment figure of $1,400, Steele stopped making quarterly assessment payments in late 2016 to "set off" her overpayment.[3]

Other relevant facts will be provided in the procedural background.

### 2.  Procedural Background

*Proceeding in the District Court for Montgomery County*

In 2017, the Association brought suit in the District Court against Steele, seeking $1,257.60 in assessments and interest[4] as well as an award of attorney's fees in the amount of $850.[5]  Steele contended that she was entitled to an offset because she had overpaid

---

[2] Lucas had no evidence that any Board member deliberately tried to overcharge the homeowners.  In fact, his letter specified that "I wish to emphasize that I do not think that this situation arose because anyone on the Board was deliberately trying to overcharge the homeowners."

[3] Joselyn Wells, who manages the Association, testified that Steele's delinquency in assessment payments began in October 2016.

[4] The Association's figure represented assessments and interest from October 2016 through December 31, 2017.  Joselyn Wells, manager of the Association, testified that, on July 17, 2017, "the assessments were accelerated through the end of the year . . . [in order] to place a lien through 2017."  The Declaration provides that delinquent assessment payments bear interest at the annual rate of six percent.  Article V, § 5.

[5] Though the record contains evidence of the Association's attorney's fees, including its engagement agreement, "invoices associated with the representation of the Association in the case against Diane Steele[,]"and a billing note through July 20, 2018, there is no reference to an $850 figure.  Several of Steele's motions and her filed writ of

4

through illegitimate dues increases in 2007, 2011 and 2014.  Steele's motion for judgment, based on failure to prove the amount of dues owed, was granted at the close of the Association's case.  The Association noted a *de novo* appeal to circuit court, and a trial was scheduled on July 12, 2018.

*Proceeding in the Circuit Court for Montgomery County*

On appeal, the Association maintained its assessment value of $1,257.60 against Steele, but sought attorney's fees in the amount of $26,589.13.  The Association called Joselyn Wells ("Wells"), manager of the Association, as its first witness.  Wells testified regarding assessments and Steele's Statement of Delinquency Assessments ("Statement"), which was admitted into evidence over Steele's objection (objecting to the Statement on the grounds that the interest calculation was incorrect).  Wells also testified regarding the additional attorney's fees requested by the Association, stating that the invoices for attorney's fees were "in line" with fees she had previously seen.  Wells further indicated that she learned of Steele's objection to the calculation of assessments once she turned Steele's account over for collection.

Laura Tierney ("Tierney"), a current Board member, also testified on behalf of the Association.  Tierney testified that even with dues at their present rate of $240 per quarter, or $960 per year, the Association was showing a net loss and was underfunding its reserve fund for capital expenses.  When asked why the Association was spending far more on

---

*certiorari* to this Court, however, maintain that the District Court Complaint in this case requested attorney fees in the amount of $850. The Association's opposition to Steele's motion to alter or amend the circuit court judgment also reiterated the $850 figure in its contention that the amount was subject to increase.

5

attorney's fees than its receipt of fees owed by Steele, Tierney stated that enabling the District Court decision to stand "would result in the financial ruin of the community," should the decision apply to all the Association homeowners.

At the conclusion of the Association's case, Steele moved for judgment based on failure to prove the amount of dues owed, which was denied.

Lucas testified on behalf of Steele, explaining his discovery that increases in the assessments from 2007, 2011, and 2014 did not receive the requisite two-thirds vote as required by the Declaration. He further testified about his September 2016 letter, which he first provided to the Board and later mailed to homeowners.

During Steele's testimony, she admitted that: (i) she likely received the Association newsletters informing her of fee increases in 2003, 2007, 2011, and 2014; (ii) she was capable of attending open Board meetings; (iii) she could have requested Association records at any time; and (iv) she was on record notice of the Declaration and its provisions. However, Steele indicated that she did not act until receiving Lucas's September 2016 letter.

*Circuit Court Ruling*

On August 7, 2018, the circuit court awarded judgment in the full amount of $1,257.60 plus $4,200 in attorney fees in the Association's favor.

(a) Rationale for Awarding Assessment Fees

In its oral ruling, the circuit court elaborated on three alternative grounds for awarding the Association assessment fees, which are outlined below.

As to the first ground, the circuit court stated:

The first issue that the Court has to address is whether or not [ ] Steele's position in this case amounts to a defense of ultra vires and that the action by [the Association] in raising the dues would be an ultra vires act. The Association says that it is. [ ] Steele says it is not, and it was really just a [b]reach of the contractual agreements between the parties.

Transcript of Proceedings, *Diamond Farms Homes Corp. v. Steele*, Circuit Court for Montgomery County, Case No. 9777-D. The Court analyzed the Declaration and held that "it's not a simple mere contract but is an organizational document." The circuit court further found that Steele's claims were "really a defense of capacity or power of the corporation[.]" Based on these assertions, the Court applied Md. Code, Corporations and Associations ("Corps. & Ass'ns") § 1-403 to the case. The statute states, in pertinent part:

\*\*\*

(a) **Unless a lack of power or capacity is asserted in a proceeding described in this section**, an act of a corporation or a transfer of real or personal property by or to the corporation **is not invalid or unenforceable solely because the corporation lacked the power or capacity to take the action.**

\*\*\*

(b)(1) **Lack of corporate power or capacity may be asserted by a stockholder in a proceeding to enjoin the corporation from doing an act** or from transferring or acquiring real or personal property.

\*\*\*

(emphasis added). According to the circuit court, if Steele sought to attack the authority of the Association to collect assessments, she had to pursue the procedures outlined in Corps. & Ass'ns § 1-403 ("ultra vires statute"). Because she failed to follow these

7

procedures, the circuit court concluded that she was precluded from asserting a defense against the Association.

Regarding the second ground, the circuit court found that the homeowners' action, including Steele's action, of continuing to pay the increased assessments since their passage, constituted acquiescence or ratification of the increases (citing *Poole v. Miller*, 211 Md. 448, 128 A.2d 637 (1957)).

As to the final ground for its holding, which addressed the Association's defense of laches, the court held:

> I'm not sure if it's really laches that the argument is or more of an equitable estoppel or an estoppel argument in that a nine-year delay [since the 2007 increase] in asserting [Steele's] rights would be unreasonable and during that time, [the Association] was prejudiced because a more timely request for strict enforcements of the two-thirds [b]y-law would have allowed the [Association] to potentially remedy the defect in a more timely manner, or if it could not be remedied . . . the [Association] would have then had an ability to properly budget for the decreased amount of revenue.

Transcript of Proceedings, *Diamond Farm Homes Corp. v. Diane Steele*, *supra.* The circuit court concluded that, under a theory of laches or equitable estoppel, Steele's delayed claim prejudiced the Association and was therefore precluded.

According to the circuit court, these three grounds justified awarding assessment fees in the Association's favor.

(b) Rationale for Awarding Attorney's Fees

Diamond Farms sought attorney's fees in the amount of $26,589.13. The circuit court held that Wells's testimony was sufficient for establishing attorney's fees in the small claims case at issue, where the formal rules of evidence do not apply. *See* Md. Rule 7-

8

112(d)(2).[6] After considering a number of factors, the court concluded that the uppermost range of permissible fees would be three times the amount in controversy. The court awarded $4,200 in attorney's fees.

Steele filed a Motion to Alter or Amend the Judgment, which was denied. Thereafter, Steele filed a petition for *certiorari* to this Court, which we granted. *Steele v. Diamond Farm Homes Corp.*, 462 Md. 84, 198 A.3d 219 (2018).

## STANDARD OF REVIEW

Neither Steele nor the Association challenged the circuit court's factual findings regarding the first issue. As such, only the court's legal findings are in dispute. Errors of law and purely legal questions are reviewed *de novo* and this Court affords no deference to the decision of the court below. *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175, 184 (2006).

The standard of review related to issue two, the circuit court's award of attorney's fees, is abuse of discretion. *Monmouth Meadows Homeowner's Ass'n v. Hamilton*, 416 Md. 325, 332, 7 A.3d 1, 5 (2010).

---

[6] Md. Rule 7-112(d)(2) states:

**(d) Procedure in Circuit Court.**

\*\*\*

(2) If the action in the District Court was tried under Rule 3-701 [small claim actions], there shall be no pretrial discovery under Chapter 400 of Title 2, the circuit court shall conduct the trial de novo in an informal manner, and **Title 5 of these rules does not apply to the proceedings.**

(emphasis added). Title 5 of the Maryland Rules pertains to evidence.

9

**A. The ultra vires statute and the doctrine of equitable estoppel preclude Steele's defense.**

1. <u>The ultra vires statute operates as a bar to Steele's defense.</u>

The Association contends that Steele's defense—that the Association's fee increases were invalid—is a defense rooted in the premise that the Association lacked the power or capacity to take such action. The Association claims that the assertion that it lacked power or capacity is embedded in the ultra vires statute. Because the statute has specific criteria for bringing ultra vires claims, the Association asserts that Steele's defense is precluded on procedural grounds. We agree.

The ultra vires statute, Corps. & Ass'ns. § 1-403, specifies that:

\*\*\*

(a) **Unless a lack of power or capacity is asserted in a proceeding described in this section**, an act of a corporation or a transfer of real or personal property by or to the corporation **is not invalid or unenforceable solely because the corporation lacked the power or capacity to take the action.**

\*\*\*

(b)(1) **Lack of corporate power or capacity may be asserted by a stockholder in a proceeding to enjoin the corporation from doing an act** or from transferring or acquiring real or personal property.

\*\*\*

(emphasis added). The plain language of the statute **required** Steele to raise an argument regarding lack of power or capacity "in a proceeding to enjoin the corporation." Steele failed to do so. We explain more fully below.

Ultra vires acts are those that exceed the express or implied powers of a corporation. *See Greenbelt Homes, Inc. v. Nyman Realty, Inc.*, 48 Md. App. 42, 57, 426 A.2d 394, 403 n.4 (1981) (internal citation omitted); *see also City of Frederick v. Pickett*, 392 Md. 411, 419, 897 A.2d 228, 233, n. 4 (2006) (internal citation omitted). In an effort to restrain corporations' unchecked powers, shareholders (or the attorney general, *see* Corps. & Ass'ns. §1-403(d)) may challenge ultra vires acts.

The instant matter considers the Association's lack of power or capacity to improperly increase dues pursuant to an express provision in its Declaration. We first observe that the Association is a corporation. The record reflects that the State Department of Assessments and Taxation of Maryland approved and received the Association's Articles of Incorporation on April 21, 1969. We next analyze the situations in which a corporation's actions are considered ultra vires. The issue we seek to resolve is whether an Association's **declaration** operates as a document establishing a corporation's power and capacity, such that exceeding the scope of a declaration constitutes ultra vires action.

In *Greenbelt*, *supra,* the Court of Special Appeals explained that: "An ultra vires act 'is one not within the express or implied powers of the corporation as fixed by its **charter, the statutes, or the common law**.'" 48 Md. App. at 57, 426 A.2d at 403 n.4 (emphasis added) (quoting W. Fletcher, Cyclopedia of the Law of Private Corporations § 3399 (rev. perm. ed. 1978)). Later, in *Pickett*, *supra*, we considered ultra vires acts to be those that are "beyond the legitimate powers of the corporation **as they are defined by the statutes under which it is formed or which is applicable to it, by its charter or incorporation**

11

**paper.**" 392 Md. at 419, 897 A.2d at 233 n. 4 (internal citation omitted) (emphasis added).[7]

"When properly used, the words 'ultra vires,' as applied to the act of a corporation, mean simply an act that is beyond the powers conferred upon the corporation by its charter, [statutes, or common law]." Fletcher, *supra* at § 3400.[8] We recognize that this jurisdiction's case law has not considered whether a **declaration** can operate as one of the documents under which a corporation can exceed its powers. *See River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 914 A.2d 770 (2007) (holding that the city of Frederick's actions were ultra vires when it exceeded the scope of its powers, as delegated in the city's **Charter**); *see also Inlet Associates v. Assateague House Condominium Ass'n,* 313 Md. 413, 545 A.2d 1296 (1988) (holding that Ocean City's **Charter** mandated an ordinance as opposed to a simple resolution for the matter at issue, and therefore, the City's actions were ultra vires).[9] Given that Maryland case law does not provide a relevant answer to our

---

[7] According to Black's Law Dictionary (10th ed. 2014), "[t]he corporate charter is often the articles of incorporation." In the instant matter, the record contains Articles of Incorporation, which we conclude to be synonymous with the Association's Charter.

[8] The concurrence contends that, should a corporation's charter, statutes, or common law provide the corporation with particular powers, it is *not ultra vires* if the corporation acts improperly in exercising those powers. We contend that a corporation's act *is ultra vires* if it acts contrary to the prescribed powers that are dictated by virtue of particular governing documents. In the instant matter, the Association simply did not have the authority to raise assessment fees contrary to express provisions, as we discuss *infra*.

[9] Furthermore, our analysis of the law of foreign jurisdictions provides conflicting authority on this matter. *Compare Davis v. Lakewood Prop. Owners Ass'n, Inc.*, 536 S.W.3d 743 (Mo. Ct. App. 2017) (holding that Missouri's ultra vires statute has a "catch all" provision that recognizes ultra vires actions as those in contravention of an Association's declaration), *and Lion Square Phase II and III Condominium Association, Inc. v. Hask*, 700 P.2d 932 (Colo. Ct. App. 1985) (holding that a condominium association actions were ultra vires when it acted contrary to its declaration), *with Mitchell v.*

12

query, we consider the functionality of an Association's declaration. The Real Property

Article of the Maryland Code ("Real Prop.") defines a declaration as:

> [A]n instrument, however denominated, recorded among the land records of the county in which the property of the declarant is located, **that creates the authority for a homeowners association to impose** on lots, or on the owners or occupants of lots, or on another homeowners association, condominium, or cooperative housing corporation **any mandatory fee in connection with the provision of services or otherwise** for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas.
>
> ***

*See* Real Prop. § 11B-101(d)(1) (emphasis added). The definition of a declaration provides

that it operates to establish the capacity of an Association with respect to fees, which is at

issue in the instant matter. This supports the position that an Association's declaration

prescribes its capacity and certain powers—the central concern regarding whether to apply

the ultra vires statute.

In the instant matter, we look to the Association's Articles of Incorporation, which

is synonymous with a Charter, *see* n. 7, and *is* subject to the ultra vires statute. The

Association's Articles of Incorporation specify that: "The purpose[] for which the

corporation is formed [is] . . . [t]o enforce any and all covenants, restrictions and

agreements[.]" Those covenants, restrictions and agreements are explicitly outlined in the

Association's Declaration, such that the Declaration operates as a key governing document

outlining the Association's powers and capacity. *See* Real Prop. § 11B-116(a)(2)(i)

---

*LaFlamme,* 60 S.W.3d 123, 128-29 (Tex. App. 2000) (treating the Association's declaration as a contract and holding that the homeowner's contention was not an ultra vires claim that required a derivative suit).

13

(stating that: "'Governing document' includes [a] declaration"). Because the Association's Articles of Incorporation expressly refers to the Declaration as a source of its power and capacity, we determine that the Declaration in the instant matter serves as a document subject to the ultra vires statute.

Our review of the Declaration of the Association and its interaction with the Association's Articles of Incorporation persuades us that both documents dictate the parameters of the Association's authority and power. Therefore, Steele's argument had to follow the procedural guidelines specified in the ultra vires statute. In the instant matter, the ultra vires statute does not provide Steele a defense under the circumstances because she did not pursue, first, a derivative action, and she may not defend on the basis of the statute in this proceeding. In other words, the ultra vires statute required that Steele pursue a derivative action, as a condition precedent, to enjoin the Association from improperly raising assessments. Steele did not bring a derivative action. Therefore, she cannot use the ultra vires statute as a defense.

2. <u>Steele's defense is also precluded based on the doctrine of equitable estoppel.</u>

*The Statute of Limitations and Laches*

In her brief, Steele contended that, because she did not assert an initial claim or cause of action against the Association, neither the statute of limitations nor laches could apply to her argument because both doctrines operate as affirmative defenses. *See* Md. Rule 2-323(g)(10) & (15). Steele further contended that, assuming *arguendo*, that either doctrine applied, she would be subject to an analysis under the statute of limitations because her argument was grounded in a contract dispute—an issue of law, as opposed to

14

an issue of equity. The Association did not address the statute of limitations in its brief, but rather, asserted that laches, "or more precisely," equitable estoppel, barred Steele's argument.

We concluded that Steele's contention—that the statute of limitations and laches operate as affirmative defenses inapplicable to her offset argument—was persuasive. As a result, we considered the circuit court's statement regarding equitable estoppel ("I'm not sure if it's really laches that the argument is or more of an equitable estoppel or an estoppel argument[,]" *see supra*). We noted that, contrary to the statute of limitations and laches, the doctrine of equitable estoppel applies to both defenses and claims, and at law and equity. *Lipitz v. Hurwitz*, 435 Md. 273, 291, 77 A.3d 1088, 1098 (2013). Our analysis provides that the doctrine of equitable estoppel precludes Steele's offset defense.

*Equitable Estoppel*

Equitable estoppel applies at both law and equity to preclude a party from asserting rights against another "who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy." *Lipitz*, 435 Md. at 291, 77 A.3d at 1098. The doctrine is "cognizable at common law either as a defense to a cause of action, or to avoid a defense." *Id.* at 292, 77 A.3d at 1099 (internal citations omitted). "Equitable estoppel essentially consists of three elements: voluntary conduct or representation, reliance, and detriment." *Id.* at 291, 77 A.3d at 1098 (internal citations and quotations omitted).

15

(a) Steele's Voluntary Conduct

Steele voluntarily decided not to challenge the validity of the dues increases, despite having access to the newsletters informing her of fee increases in 2003, 2007, 2011, and 2014. During cross examination, Steele testified that she "probably" received the 2003 newsletter "and the backup ones" though "[t]hat [didn't] mean I read [them], though." In addition, Steele was capable of attending open Board meetings during which each assessment vote occurred; she could have requested Association records at any time; and she was on record notice of the Declaration and its provisions. Instead of challenging the Association's assessment increases, Steele chose to refrain from payment.

(b) The Association's Reliance upon Increased Dues Payments

The Association relied upon the homeowners' payment of increased assessments in order to maintain safe premises and budget accordingly. During Tierney's testimony, she stated that if dues were limited to $180 per quarter:

> [The Association] would actually have to greatly reduce [its] services, so things like garbage pickup and things like that, . . . would [probably] no longer be . . . afford[able] and [the Association likely could not] provide services. Also, [the Association] would probably have to, based on [its] projected capital projects coming up over the next 15 or 20 years, . . . [eliminate] a lot of things [or push back these things] . . . even further, things such as repairing the sidewalks where [there are] tripping hazards and things like that.

> So, I think potentially without being able to do some of those things, [the Association] could be putting some of [its] members, [its] homeowners and visitors to [the] property, at some kind of risk when it comes to being out on the grounds of the property.

16

Tierney's testimony helped establish that the Association relied upon the current rate of assessments to provide services and maintain safe premises.

The Association also relied upon the increased assessments to remain financially viable, as demonstrated by Wells and Tierney's testimony, in addition to Lucas's 2016 letter. At trial, Wells testified that the Association was underfunding its reserves as of 2015 by $14,600 per year and that the Association had a loss of almost $1,000 for the 2018 fiscal year, even with the current $240 per quarter assessment. Tierney testified that the Association's "only income is . . . from dues [ ]" and that reverting the fees to the 2003 amount "would result in the financial ruin of the community[.]" Lucas's 2016 letter provided further evidence that the Association relied upon the increased assessments:

> The amount of money that was overcharged, $375,200, as of 30 September 2016, is almost exactly equal to the total amount of money that [the Association] has in the bank at the moment (most of which is in the underfunded Reserve Account). **Hence, the overcharge could not be returned without destroying the financial stability of the [Association]**.

(emphasis added). The Association clearly relied upon the increased dues assessments to remain financially viable.

(c) Resulting Detriment to the Association

Any decrease in dues would have been detrimental to the Association. The circuit court elaborated upon this detriment, stating that:

> [A] more timely request for strict enforcement of the two-thirds [b]y-law would have allowed the [Association] to potentially remedy the defect in a more timely manner, or if it could not be remedied . . . the [Association] would have then had an ability to properly budget for the decreased amount of revenue.

17

Had Steele timely brought her argument, the Association could have more-properly budgeted its expenses to avoid the "financial ruin" looming before it.

To the extent that Steele contends that a holding in her favor cannot result in the financial collapse of the entire Association, we respond that such a holding would inevitably result in contention from other homeowners that they too were eligible for withholding funds based on overpayment. Any subsequent decrease to the dues would adversely impact the Association so that it is no longer financially operable. The Association relied on Steele's voluntary conduct in good faith to its own detriment. As such, the doctrine of equitable estoppel precludes our acceptance of Steele's defense.

In conclusion, we hold that Steele's offset defense is precluded on two separate grounds: the ultra vires statute, Corps. & Ass'ns. § 1-403, and application of equitable estoppel. Because these grounds are dispositive to preclude Steele's defense, we do not reach the issue with regard to general principles of waiver, ratification and acquiescence.

**B. The circuit court did not abuse its discretion in awarding attorney's fees.**

The cornerstone for awarding attorney's fees is reasonableness. *See generally Monmouth Meadows Homeowner's Ass'n v. Hamilton*, 416 Md. 325, 7 A.3d 1 (2010) (stating that "trial courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award [and even where c]ontractual clauses provid[e] for awards of specific amounts of attorney's fees . . . trial courts are required to read [reasonableness] into the contract and examine the prevailing party's fee request for reasonableness." 416 Md. at 333, 7 A.3d at 5 (internal quotations and citations omitted)).

The Association's Declaration provides that:

18

> If the assessment is not paid. . . there shall be added to the amount of such assessment the cost of preparing and filing the complaint or bill in equity in such action, and in the event a judgment is obtained, such judgment shall include interest on the assessment as above provided **and a reasonable attorney's fee to be fixed by the court together with the cost of the action**.

Article V, § 8 (emphasis added). Therefore, the Declaration operates as a contract that provides for an assessment of attorney's fees against any homeowner, should the Association file suit.

In the case at bar, Steele contends that the Association's initial request for attorney's fees was $850 in its District Court complaint and that the Association never amended this amount to justify anything greater. The Association counters with the response that the "Complaint clearly stated that the claim for fees, like the claim for interest, was subject to increase." Because the circuit court's review was *de novo*, we do not consider the requested amount in attorney's fees at the District Court level. Rather, we review the circuit court's award of attorney's fees in the amount of $4,200 for an abuse of discretion.

Steele contends that the circuit court abused its discretion in awarding attorney's fees because the Association did not provide sufficient evidence to support the amount awarded.

Maryland Rule 2-704 guides attorney's fees as allowed by contract. According to Rule 2-704(d)(1):

> Evidence in support of or in opposition to a claim for attorneys' fees under this Rule shall be presented in the party's case-in-chief and shall focus on the standards set forth in Rule 2-703 (f)(3) or subsection (e)(4) of this Rule, as applicable.

Subsection (e)(4) is inapplicable to the case at bar. Maryland Rule 2-703(f)(3) therefore

19

guides and sets out the factors that should be considered in awarding attorney's fees. They include:

(A) the time and labor required;
(B) the novelty and difficulty of the questions;
(C) the skill required to perform the legal service properly;
(D) whether acceptance of the case precluded other employment by the attorney;
(E) the customary fee for similar legal services;
(F) whether the fee is fixed or contingent;
(G) any time limitations imposed by the client or the circumstances;
(H) the amount involved and the results obtained;
(I) the experience, reputation, and ability of the attorneys;
(J) the undesirability of the case;
(K) the nature and length of the professional relationship with the client; and
(L) awards in similar cases.

At trial, the only *explicit* evidence regarding whether the fees were reasonable was through Wells's testimony about her interaction with attorneys and her thoughts that the fees were reasonable. In considering Wells's testimony as evidence for reasonable fees, the circuit court properly maintained that Maryland Rule 7-112(d)(2) applied. *See* n. 6, *supra*. Therefore, it was appropriate to consider Wells's testimony as partial evidence of reasonableness.

In addition, the circuit court considered a number of factors espoused in Maryland Rule 2-703(f)(3) as well as this Court's holding in *Monmouth Meadows*, where we concluded that "[c]ourts should use the factors set forth in [Model] Rule 1.5 as the foundation for analysis of what constitutes a reasonable fee when the court awards fees

20

based on a contract entered by the parties authorizing an award of fees."[10] 416 Md. at 336-37, 7 A.3d at 8.

In contemplating the factors that constitute a reasonable fee, the circuit court decreased the Association's request for attorney's fees from $26,589.13 to $4,200, concluding that (i) attorney's fees in contract cases can be or even exceed, the amount in controversy; (ii) as opposed to *Monmouth*, where the defendants were not represented by counsel, Steele was represented by counsel—requiring the Association to mount "vigorous" opposition; (iii) the Association's requested fee was not reasonable based on its claim that the issues in the case were novel (holding that "[the issues are] not particularly novel and they're not particularly unusual."); (iv) the Association's requested fee was 18 and a half times the amount at issue, and "under the circumstances, given the amount in controversy, the . . . upper level of fees would be no more than three times the fees of the amount in controversy[.]" The circuit court considered the factors in Md. Rule 2-703(f) and our precedent in *Monmouth Meadows* to evaluate the requested attorney's fees for reasonableness.

We affirm the judgment of $4,200 in attorney's fees because the Declaration expressly enables the Association to seek attorney's fees in the event of a lawsuit. The circuit court provided a thoughtful analysis to derive at its determination of a reasonable

---

[10] Note that the factors considered in Rule 1.5 of the Model Rules of Professional Conduct are largely the same as those contemplated by Maryland Rule 2-703(f)(3).

fee. Accordingly, we do not determine an abuse of discretion in the judgment of $4,200 in attorney's fees.

## CONCLUSION

We conclude that Steele owes dues to the Association in the amount of $1,257.60 based on our interpretation of the ultra vires statute, Corps. & Ass'ns. § 1-403, and application of the doctrine of equitable estoppel. We do not consider laches or limitations, or the circuit court's conclusion regarding general principles of waiver, ratification and acquiescence. We further hold that the circuit court did not abuse its discretion in awarding the Association $4,200 in attorney's fees because it properly considered factors of reasonableness.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 59

September Term, 2018

_____

DIANE STEELE

v.

DIAMOND FARM HOMES CORP.

_____

Barbera, C.J.,
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D.
(Senior Judge, Specially Assigned),

JJ.
_____

Concurring Opinion by McDonald, J.,
which Adkins, J., joins.
_____

Filed: June 26, 2019

I concur in the Court's disposition of this case, but solely on the ground of equitable estoppel. I do not join the Court's alternative holding which, in my view, is based on a misunderstanding of the concept of *ultra vires* corporate action and a misapplication of Maryland Code, Corporations & Associations Article ("CA"), §1-403.

Ms. Steele herself did not allege that the homeowner's association ("the Association") had committed an *ultra vires* act. Rather, it is the Association that has characterized her defense to its complaint as such and then interposed CA §1-403 as an impediment to that imagined defense. This was creative on the part of the Association. But it is a classic "straw man" argument.

The Association filed its complaint in the District Court as a contract action based on particular provisions of the Declaration of Covenants, Conditions and Restrictions, ("Declaration") which the Association referred to as "the Contract" in its complaint against Ms. Steele. Ms. Steele asserted, in her Notice of Intention to Defend, that she was not liable under those same provisions of the Declaration because the Association had failed to comply with its own obligations under that document – *i.e.*, what the Association had referred to as "the Contract." The Association then took the position that the issue of compliance with "the Contract" (at least on its part) was a question of *ultra vires* corporate action. In none of her pleadings in the District Court or Circuit Court did Ms. Steele suggest that the Association had acted *ultra vires*.

*Ultra vires* is a Latin phrase that means "beyond the powers." As the Majority opinion correctly notes, an *ultra vires* act of a corporation is one that is beyond the powers or purposes of the particular corporation. Majority slip op. at 10-11. Here it is undisputed

that one of the purposes of the Association is to maintain properties, services and facilities in Diamond Farm and that one of its powers is to collect an annual assessment from the residents for that purpose. Declaration, Article V. What Ms. Steele asserted in defense of the Association's complaint against her was that the Association had failed to follow its own rules under the Declaration in carrying out its legitimate purposes and powers. The fact that the Association may have carried out one of its powers in an irregular or unauthorized manner does not convert that act into an *ultra vires* act.

A leading corporation law treatise has explained that "if a corporation's act was within the corporate powers, but was performed without authority or in an unauthorized manner, the act is not ultra vires." 7A Fletcher Cyc. Corp. §3401. Fletcher further notes that certain corporate actions are "inaccurately said to be *ultra vires* where the power exists to do what was done, provided the corporation does it in a prescribed way…. In other words, the irregular exercise of an unquestioned power of the corporation is not ultra vires." *Id*. §3402. A specific example offered by Fletcher is where a corporation takes an action within its purposes and powers but "the required consent of shareholders is not obtained." *Id*.

Much like Fletcher's example, Ms. Steele asserted that the requisite assent of the appropriate percentage of members of the Association was not obtained to do what is clearly within the corporate purpose and power of the Association to do – raise the assessment. While she is certainly claiming that the Association exercised its powers improperly, she is not asserting that it acted *ultra vires*.

CA §1-403 sets limits on litigation only when the actions at issue are truly alleged to be *ultra vires*, not when it is alleged that a corporation acted within its purposes and powers, but did so in some improper manner. A similar distinction can be found in the commentary to the model corporation law from which CA §1-403 was derived. In particular, the Maryland statute was based upon what is now known as §3.04 of the Model Business Corporation Act. The commentary to that part of the model act states, in pertinent part:

> Section 3.04 … does not address the validity of essentially intra vires conduct that is not approved by appropriate corporate action: [*The commentary then gives an example, similar to Fletcher's, of a corporate action taken without a required approval of the corporation's shareholders*]. This type of transaction is not beyond the purposes or powers of the corporation; it simply has not been approved by the corporate authorities as required by law.

American Bar Association, 1 Model Business Corporation Act Annotated (2013) §3.04, *Official Comment*.

This case thus provides yet another illustration of Fletcher's observation that "[t]here is possibly no legal term used as loosely and with so little regard to its strict meaning as the term '*ultra vires*.'" 7A Fletcher §3399. The discussion of the concept of *ultra vires* in the Majority opinion has the potential to sow confusion such that simple violations of corporate procedures could be misunderstood as rendering the corporation's action *ultra vires* and litigation undertaken to hold a corporation accountable for misconduct (that is not *ultra vires*) is blocked by the misapplication of CA §1-403.

Judge Adkins has advised that she joins this opinion.

3